**WOODWORTH, Collector of Internal Revenue, v. KALES.**

Circuit Court of Appeals, Sixth Circuit.    May 10, 1928.

No. 5052.

1. Internal revenue ⊙⟳25—Authority of officers to reassess tax must be by express words of statute or by clear implication.

Where the ascertaining of an essential fact in determining essential elements of tax liability is left to discretionary judgment of officers, and they exercise such discretion in good faith, and tax is computed and paid, they may thereafter reopen and reassess tax only if statutes give them authority therefor, and such authority must be by express words or by clear implication.

2. Internal revenue ⊙⟳25—Additional assessment upon income from Ford stock sale after numerous confirmations of original assessment, based on 1913 valuation, held unauthorized (Revenue Act 1918, § 250b [Comp. St. § 6336⅛tt(b)]; Revenue Act 1924, §§ 280, 1006 [Comp. St. §§ 6336½zz(7), 6371⅝h]).

Where income tax was assessed in 1919 under Revenue Act of 1918 on profits from sale of Ford Motor Company's stock based upon fair value of stock in 1913, and such assessment and valuation were approved and confirmed by the then commissioner of internal revenue and by his successors, held that commissioner was without authority under Revenue Act 1918, § 250b (Comp. St. § 6336⅛tt(b), Revenue Act 1924, §§ 280, 1006 (Comp. St. §§ 6336½zz(7), 6371⅝h), to revoke such assessment and reassess an additional tax upon a new valuation resulting from a "matured and better judgment;" there being no claim of fraud or mistake, clerical or otherwise.

In Error to the District Court of the United States for the Eastern District of Michigan; Benjamin C. Dawkins, Judge.

Action by Alice G. Kales against Fred L. Woodworth, Collector of Internal Revenue. Judgment for plaintiff on a directed verdict, and defendant brings error. Affirmed.

John A. Baxter, Asst. U. S. Atty., of Detroit, Mich., C. M. Charest, General Counsel, Bureau of Internal Revenue, of Washington, D. C., and Earl J. Davis, Herbert W. Clark, W. Hall Trigg, and A. W. Gregg, Sp. Asst. Attys. Gen., for plaintiff in error.

Beaumont, Smith & Harris, of Detroit, Mich., and Charles E. Hughes, of New York City, for defendant in error.

John W. Davis, of New York City, Sidney T. Miller, of Detroit, Mich., Joseph E. Davies, of Washington, D. C., Arthur J. Lacy and Clarence E. Wilcox, both of Detroit, Mich., Herbert Pope, of Chicago, Ill., and Luman W. Goodenough, of Detroit, Mich., amici curiæ.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

DENISON, Circuit Judge. The court below directed a verdict in favor of the plaintiff, Mrs. Kales, in her suit against the collector to recover that part of her income tax for 1919 which she had paid under protest. The critical question—one of fact—was as to the fair value on March 1, 1913, of certain Ford Motor Company stock which Mrs. Kales had then owned, and which she sold in 1919.[1] The trial court thought each one of three grounds to be sufficient to support the directed verdict. They were: (1) That, upon a fixing of this value by the commissioner and a sale by Mrs. Kales in reliance on that valuation, an estoppel arose in her favor as against the later attempted revaluation; (2) that the assessment of the tax which the commissioner made upon the return of 1919, and which was based upon this 1913 valuation, and the later approvals of that assessment by the commissioner (and his successors), established that valuation beyond the power of that officer—except for a good cause non-existent here—to reopen and reconsider, and this by analogy to a thing adjudicated; and (3) that the deficiency assessment of 1925 which had required the payment now in dispute was void for lack of jurisdictional basis. While we rest our affirmance upon the second of these grounds, the three are not without effect upon each other; and they require a fuller statement of facts—including not only those stated in the declaration, but some things assumed as true by all counsel in the case. Blodgett v. Holden, 275 U. S. 142, 146, 48 S. Ct. 105, 72 L. Ed. ——.

In 1919 Mrs. Kales owned stock in the Ford Motor Company, and was asked to sell it for $12,500 per share. She would have to pay as an income tax about two-thirds of whatever taxable profit she realized on the sale; and the amount of such profit would depend upon the fair value as of March 1, 1913. Hence whether the offer should be accepted would depend largely upon that fair value. There had been in 1913 no market

---

[1] After the trial before a jury was entered upon, counsel for the defendant admitted the truth of everything well pleaded in the declaration; and hence the basis of the court's action is to be found in the recitals of the declaration, modified if at all, by the consideration whether they are well pleaded as fact allegations. This concession did not include any statement of the actual 1913 value of the stock, if such statement there was.

price; and so it was evident that the antedated valuation as of this earlier period would depend upon what should then have been considered the reasonable prospect of future earnings, and that six years later the best that could be done would be to make an honest and intelligent estimate of the 1913 value. In this situation, the buyers applied to Commissioner of Internal Revenue Roper, and requested official inquiry and action, fixing the 1913 valuation for the guidance of those who were asked to sell. Accordingly, and (it may be assumed) after such inquiry by the experts of the Department as he thought proper, he fixed upon a figure of about $9,500 per share as the fair 1913 value. Mrs. Kales was informed of this action, and, relying thereon, sold her stock, and included in her 1919 return a profit of about $3,000 per share. She filed this return on March 25, 1920, and paid one-quarter of the tax shown by the whole return, which included also other items. Later that year the return was examined and the tax assessed by (acting) Commissioner Meyers upon the $3,000 basis, a notice of such assessment was by him given to her, and she paid the remaining installments. In January, 1921, the return was further examined, and a deficiency assessment was levied by Commissioner Williams, based upon some other items of income. The assessment which included the Ford stock sale was not disturbed, but the correctness of the return in this respect was approved and confirmed by this commissioner. Later in 1921, the return was again examined by the agents of the department. A report was made approving the stock valuation which had been fixed by Commissioner Roper, and the correctness of the return and the resulting income in this respect was again approved and confirmed by Commissioner Williams. Once more, in 1922, the return was further examined by Commissioner Blair, and a deficiency assessment levied as to other items, but the correctness of the return as to this item was again confirmed. Mrs. Kales' claim of abatement as to this second deficiency assessment was denied and, after payment, a refund was refused, but in both cases Commissioner Blair confirmed and approved the return based upon the Ford stock sale and its 1913 valuation.

On March 13, 1925, Commissioner Blair (by deputy) levied a further deficiency assessment upon the income from this Ford stock sale, and upon the theory that the fair value of the stock in March, 1913, had been about $2,500 per share—thus indicating an additional profit of about $7,000 per share.[2] This 1925 assessment was made without notice or hearing, but in claimed pursuance of the statute which permits so-called jeopardy assessments (section 274d, Revenue Act of 1924; Comp St. § 6336⅛zz(1) (d), but there was no theory or claim of jeopardy, or any jeopardy in fact, except that the five-year statute of limitations was about to expire. It also appears that as to the first valuation by Commissioner Roper, as well as to the subsequent confirmations thereof, there is no claim of fraud or misleading or of new evidence, or of mistake of law or of specific fact, but that the new estimate of value is only a variant inference from the same evidential facts upon which the earlier estimate was founded—the language of counsel for the Government stating the only claim of justification for the reassessment to be that it was "a new and better view of the same

---

[2] This record does not show the conflicting theories of estimate at the basis of the 1919 and 1925 valuations respectively; but others of this selling group who were reassessed in 1925, as Mrs. Kales was, appealed to the Board of Tax Appeals. Counsel for those appellants, filing a brief in this case, as amici curiæ, state the facts said to appear without dispute in that record. Of course, these facts cannot be thus brought into this record; but they may serve as an illustration of what might well be the concrete facts covered by the more abstract terms found in the declaration; and the claims of the government may well be tested by application to such supposed facts. They are: In 1919, the examiners had before them the profits of the company for a series of years as well as the fact that about 1912 new methods had been adopted and great expansion of business had occurred, indicating that the profits of the years before 1912 would not be typical of 1913, and thereafter. The examiners took the profits for January and February, 1913, and multiplied them by six, thus getting an estimate for that year; they took the profits for 1912; théy averaged the two years; and this averaged annual profit they capitalized on a 10 per cent. basis. With the same information before them in 1925, the new experts followed another formula which apparently differed from the first chiefly in that it was based upon the (approximate) five-year period, 1908–1912; they thus reached the $2,500 figure. Later, the Department relied upon still another formula which took the profits for the (approximate) five years, ending March 1, 1913, and computed therefrom and assumed an annual average profit, from that deducted a supposedly normal profit of 8 per cent. upon the average annual inventory of tangibles, attributed the remaining profits to intangibles, and then capitalized the average tangible profit at 10 per cent. and the average intangible at 15 per cent.—thus reaching a value of about $3,500. Obviously the result can be varied at the pleasure of the inventor of formulas.

facts" based upon a "matured and better judgment."

This 1925 deficiency assessment was paid, and this suit was brought.

We pass without consideration the theory of estoppel, intimating no opinion. The full exercise of the governmental power of taxation doubtless requires that the authority of the taxing officer to do tax limiting acts should itself be limited; but, however that rule of limitation should be here applied, the same considerations which are urged to make out estoppel have also much force in deciding as to the finality of an assessment once made.

[1] Where the Revenue Act itself determines the essential elements of the tax liability and leaves to the officers only the duties of computing and collecting, there would be no finality, if they leave these ministerial acts half done or wrongly done; but, where the ascertaining of an essential fact is left to their discretionary judgment, where they exercise that discretion in good faith, and where thereupon the tax is computed and paid, it seemingly must be the theory of normal operation that the matter is closed. If not closed, it must be for some reason which makes the case abnormal. When assessing officers fix the value of real estate as a basis for ad valorem taxation, and the tax is paid, may they, after one or two years, reassess, and then again and again? When they ascertain and fix the value of property as a basis of an inheritance tax, and the tax is computed and the estate closed, may they much later reopen and reassess? They may; but on one condition only—that the statutes give them authority therefor; and it is obvious, we think, that the authority must be by express words or by clear implication, in order to confer a power so extraordinary and so pregnant with danger of official oppression.

[2] Coming to the present case, we must observe that the question of authority is much narrowed. When this return was filed, it was the duty of the commissioner to "examine * * * as soon as practicable." Section 250b of the Revenue Act of 1918, 40 Stat. p. 1082 (Comp. St. § 6336⅛tt(b). The whole section seems to contemplate an assessment by the commissioner, and subdivision (d) expressly provides that the "amount of tax due under any return shall be determined and assessed by the commissioner." If he had done nothing except to receive without objection the payment tendered, we would have a broader question not now involved. According to the admitted facts, he examined the return and assessed the tax based upon the return; and this assessment necessarily approved and confirmed the $9,500 valuation. It may be of importance that this assessment was not merely pro forma, by a hasty acceptance of the return. It may, we think, rightly be assumed that the commissioner then had in his files the report of his experts upon this exact question, and that this gave him knowledge of every essential foundation fact which has even yet been thought to be important. It is not to be supposed that any return —much less this one—would be approved and adopted as the basis of assessment without as thorough an examination as the commissioner thought proper. No reason can be suggested why, in this case and after the filing of the return, he should do the valuation work over again, or why he might not adopt as and for his examination and appraisal subsequent to the return those which he had made in anticipation of it. The legal effect of Commissioner Meyers' action is at least as important as if, after return filed, he had made this study and appraisal, and thereupon "determined and assessed the tax."

The question of the authority to make the 1925 assessment may be, for the purposes of this case, still further narrowed by the repeated approvals and confirmations; certainly the authority remaining in the commissioner in 1925 is not thereby increased. The same considerations apply to the lack of identity between successive commissioners. The power of a successor officer to vacate his predecessor's order may well be less than his power to vacate his own (a subject hereafter further mentioned); if so, the successor's authority here involved is thereby lessened.

The question of authority is made still narrower, and in a most important aspect, by the concession that in the earlier appraisal and its confirmations there was no fraud, no misleading, no mistake of law, no mistake of computation, and no mistake of specific fact.

We come then to inquire what statutory authority is claimed for the right to reopen and re-examine this question of the 1913 fair value of this stock, and then, upon a re-examination of the same evidence, to reach a different result, flowing not from the discovery of any fraud or mistake, clerical or otherwise, in any fundamental fact or matter of law, but resulting only from a "more matured judgment." It is not claimed that the authority can be found granted by any express words in any statute; but it is said

to have sufficient basis in proper implications. In considering them, we must observe that there are implications which are reasonable, and hence to be adopted, and implications which, though possible, are unreasonable, and hence to be rejected. Every suggested implication should be tested to determine how it should be thus classified; and this testing should be in view of familiar rules affecting official action, and in view of the general plan and purposes of a revenue law, and with due regard to fair treatment of the taxpayer.

One of the chief reliances of the government's counsel for the necessary implication is upon section 250(d) of the Revenue Law of 1918 (Comp. St. § 6336⅛tt(d), which we assume to be applicable to this tax, and which says that, excepting for fraud, the tax shall be assessed upon any return within five years after the return is made. This is said to imply that assessments can be made before this term expires. Of course it does, but no such implication is necessary, since the power to examine the return and make the assessment is clearly implied or given by earlier sections. To go further and to say, as government counsel do, that, because this statute implies that some reassessments may be made if within the term, it therefore implies that any reassessment may be, and thus to make no distinction between reassessments once lawful, but which cannot be made after the stated period, and unlawful assessments which never could have been made at all, is an obvious non sequitur. The question with which we are concerned is whether, after the valuation by Commissioner Roper and its adoption by Commissioner Meyers and its confirmation by Commissioner Williams—not to say Commissioner Blair—there was any authority for a new valuation. If there was, it must be exercised before March, 1925; but this time limitation can have no bearing upon the existence of the authority one or two or three years before the time expired. We must reject this dependence upon the statute of limitations to raise the desired implication as being without any weight.

The argument is also made that, since several statutory references imply, and the plaintiff concedes, that a reassessment might have been made, even after all these confirmations, if there had appeared fraud or mistake, or misleading, or new evidence, or clerical error, or mistake of law on the part of the commissioner, therefore the assessments formerly made were open, and were subject to revision even to the extent of a new inference on the same facts. This argument would have much force—how much

we need not decide—if we were undertaking to apply to the quasi judicial act of the commissioner in making this valuation the ordinary rules of res judicata as applied to judgments; but it has no force as to the narrow question of implied authority here involved. Making a reasonable implication does not compel us to make an unreasonable one. When a public official, exercising his discretion, has decided a matter of private obligation, and the decision has been accepted and acted upon, it is natural to suppose that his right to change his mind and overrule the decision should bear some analogy to the situation between individuals, in their contracts or their lawsuits. Their conclusions may always be revoked for fraud or misleading, or mutual mistake of fact, sometimes for newly discovered facts, and sometimes for clerical error or mutual mistake of law; judgments between them can sometimes be set aside on these grounds. All these considerations naturally apply to such official action as here involved; and, as the commissioner has authority only to carry out the statute, and cannot give himself more by supposing that he has more, his mistake of law will often, or usually, justify a revision of his conclusion. No analogy drawn from the rights of individuals or from the powers of courts can be found for revoking a conclusion once deliberately made and acted upon and basing the revocation merely on the idea that the second conclusion is the result of a better matured judgment. For these and other considerations we conclude that authority to review and revise such a valuation as this for fraud, mistake, or analogous ground is reasonably to be implied from the statutes, while power thus to repudiate the former action, merely because the commissioner has changed his view (or his predecessor's) of the evidence, is not reasonably implied.

This principle just stated, that an implication depends upon whether it is reasonable or unreasonable, may extend even to differentiating the revocation of such a valuation as this by the commissioner who first made it from its revocation by his successor. There might be room to find that, even if an implication of the former right were reasonable, one of the latter would not be, and hence to conclude that the reassessment by Commissioner Blair was unauthorized, even though it might have been authorized if made by, for example, Commissioner Meyers; but we do not inquire whether this distinction exists.

Reliance for the necessary implication of authority is also based upon section 1006 of

the Revenue Act of 1924, 43 Stat. 346 (Comp. St. § 6371⅝h), which provides that the taxpayer and the commissioner, with the approval of the Secretary, may make an agreement in writing that the assessment and payment of a tax shall be final and conclusive, and that, in that event, the case shall not be reopened, except upon a showing of fraud or the like; and it is said that cases which have not been thus closed by this written agreement may therefore be reopened. This presents the same situation as that found with reference to the statute of limitations. Lacking this section 1006 or other limitation, cases could be reopened for fraud, and could be reopened for mistake of fact, or error of law or of mathematical computation; but could not be reopened, we are assuming, in order to make a contradictory inference of fact based on the same old evidence. The written agreement prevents all those reopenings which might have been made, except those on the ground of fraud; non sequitur that it permits those which otherwise could not have been made at all, and thus transforms an absence of lawful ground for reopening into a valid ground therefor.

Other reasons urged for finding the necessary implication justify brief mention. The taxpayer's right of appeal and review in the Department or in the courts, even though it extends completely to the whole question of the 1913 valuation, is not inconsistent with the finality of the commissioner's action when it is not appealed from, and when the finality is confined within the narrow scope which we have specified. If such action exhausts the authority of the commissioner to that limited extent, this conclusion is none the less true because the authority might have been prolonged or transferred by review proceedings which were not taken. Section 280 of the Act of 1924 (Comp. St. § 6336½zz(7) doubtless contemplates that there would thereafter be deficiency assessments on returns made under the 1918 law; but we think the section plainly means, and means only, that whatever deficiency assessments might have been made under the earlier law can thereafter be made as if the 1924 act had not been passed; but that, if so made, they shall be collected in the manner provided by the later law. The section, we think, has no bearing upon the question whether the authority to assess under the 1918 act for the sole reason now claimed had or had not been exhausted by such a course of conduct as is here involved.

Much is made of the contention that the tax is levied by the act, and that, whatever the true tax is, the commissioner's duty is to persevere in his efforts until he collects it all, quite regardless of whether he has once decided, upon all the facts involved and within his discretionary power, what the tax is, and then has collected it all. We do not think that the law itself completely levied the tax in any such sense. The law expressly provided that the 1913 valuation should determine whether a particular sale created any taxable profit, and implied that the commissioner should decide this fact. Until the fact was decided, no one knew whether any tax was levied. We do not see that the theory of levy by the act, ipso facto, has any bearing upon the issue of whether the commissioner's authority was exhausted.[3]

Elaborate briefs upon both sides argue many points which we have not mentioned; but we think they do not justify the prolongation of this opinion. It remains to consider whether there are authoritative or persuasive opinions for or against the conclusions we have stated. Upon most of the issue argued it must be said that there is no decision which cannot be considerably differentiated. There is, however, a line of cases holding that such departmental action as is here involved cannot be reviewed and reversed for the reasons here claimed. The cases are cited in the note.[4] Their application is not criticized by the government counsel, excepting for the reason that the situations which these cases consider did not contain such a statute of limitations as we have here; but we have pointed out the general reasons why the existence of this statute is not important; and, so far as the argument is not met by these reasons, it may be noted that the power to upset and undo everything will be as obnoxious to public policy and orderly procedure, if exercised just be-

---

[3] Neither the Dollar Savings Bank Case, 19 Wall. 227, 22 L. Ed. 80; the Tilden Case, 23 Fed. Cas. No. 16, 519, pages 161, 168; or the Nashville R. R. Case (C. C. A. 6) 249 F. 678, 685, arose under a statute which necessarily contemplated that the taxing official should make an inquiry and finding as to a specific fact, preliminary to knowing the base upon which the tax, if any, would be computed. Even under such a statute, a suit to recover the tax might lie, though the officer had neglected this duty; but when he has performed the duty, the finality of his action is another matter.

[4] 34 Corpus Juris, p. 878; U. S. v. Kaufman, 96 U. S. 567, 24 L. Ed. 792; Johnson v. Towsley, 13 Wall. 72, 20 L. Ed. 485; Waddell v. U. S., 25 Ct. Cl. 323, 327, 7 L. R. A. 861; Jackson v. U. S., 19 Ct. Cl. 504, 509; Penrose v. Skinner (D. C.) 278 F. 284, 286, and cases cited; Id. (D. C.) 298 F. 335; State v. Lyons Co., 184 Wis. 175, 176, 197 N. W. 585, 199 N. W. 48.

fore as if just after five years. We therefore conclude that these cases support the principle we have stated and the conclusion we adopt. Their general result is well put by the Wisconsin case cited, as follows:

"This statute supports no inference that it was the legislative thought that the commission, having once acted upon facts fully before it and exercised its best judgment thereon, could years later change its judgment as to those facts and apply such changed judgment to the same facts that it knew years before when it made its original assessment. If this were so, there would be nothing to prevent the tax commission next year from again changing its judgment as to the rate of depreciation that should be allowed and to make additional assessments for the same years. This process might be repeated again and again though in each reassessment identically the same facts would be present. The only justification for the reassessment would be that the commission has changed its judgment as to what should be the proper rate of depreciation. Such a statute so construed might well be declared unconstitutional as being so unreasonable and oppressive as not to come within the constitutional requirement of due process of law."

The same essential condition, though the case involved also successorship, was stated, in terms which we adopt, in Penrose v. Skinner (D. C.) 298 F. 335, 337, as follows:

"No one will contend that a succeeding commissioner could overrule or ignore the decisions of his predecessor, unless such decision were in law erroneous or tainted with fraud [or mistake]. Any other conclusion would bring chaos in governmental administration and cause untold annoyance to our citizens."

The judgment is affirmed.