**KELLEY v. UNITED STATES.**

No. 7198.

District Court, D. Massachusetts.

April 24, 1939.

Allen & Barnes, Claude L. Allen, Howard C. Connor, and Kendall A. Sanderson, all of Boston, Mass., for plaintiff.

John A. Canavan, U. S. Atty., By: C. Keefe Hurley, Asst. U. S. Atty., and Davis Haskin, Asst. to U. S. Atty., all of Boston, Mass., and James W. Morris, Asst. Atty. Gen., and Andrew D. Sharpe and Wm. B. Waldo, Sp. Assts. to Atty. Gen., for the United States.

BREWSTER, District Judge.

This is a petition brought against the United States to recover income taxes paid upon income for the year 1919. The questions presented involve the valuation of plaintiff's closing inventory of December 31, 1919.

1. The plaintiff is engaged in the business of tanning raw skins, although it appears that a substantial part of his gross income during the year 1919 was derived from the sale of such raw skins.

2. On August 10, 1920, plaintiff filed a tax return which showed a tax liability of $345,808.82, on account of which plaintiff paid, during 1920, the sum of $259,356.62.

3. On February 23, 1921, the plaintiff filed an amended return of 1919 income, which showed a tax liability of $229,662.-08; at the same time, he filed a claim for an abatement of $86,452.20 and for a refund of $29,694.54. This claim for reduction of the assessment was based largely on the

ground that the finished leather was priced at the selling market instead of cost of raw materials plus cost of tanning.

4. The goatskin market in 1919 was an abnormal one, due largely to the lifting of war restrictions, which was followed by excessive buying on a rapidly rising market. The trend was upward until about October, 1919, when prices began to go down, but the sharp break did not occur until after the middle of the following year. It was because of this abnormal condition that in May, 1922, representatives of the Bureau of Internal Revenue held a conference with representatives of several leading tanning companies, engaged in the tanning of foreign goatskins. This conference was called "for the purpose of determining current bid prices for different grades of foreign goatskins as of December 31, 1919," and to "establish a satisfactory market value to be used as a basis for valuing skins imported from Europe, Asia, Africa and South America that may be in inventories, as of December 31, 1919, of concerns using the same." At that conference certain skins were selected as the standard grade for their respective groups, and prices opposite each were accepted as representing the fair market price as of December 31, 1919, for the average run of skins of each grade. The relation in percentage which one grade of skin bore to another was to be the same as that appearing in a maximum price list which the War Industries Board had issued in 1918.

Following this conference, the prices set forth in the report were accepted as representing market prices on December 31, 1919, in all cases pending in the Bureau of Internal Revenue, and were applied as market prices (when lower than cost) in closing cases, not only of the taxpayers represented at the conference but a substantial number of other taxpayers also.

This continued until some time about January 1, 1927, when, as to cases still pending among others, the question was raised as to whether transportation charges should be added to conference prices in determining market. It was not until 1931 that the Commissioner determined that these charges should be added, and thereupon cases pending at that time, except the plaintiff's, were closed, conference prices being taken as market when lower than cost, with transportation charges added.

The prices thus fixed will hereafter be referred to as the "established conference prices", and the government maximum price list will be hereafter referred to as the "G. M. P. list".

5. In 1923, a representative of the Bureau of Internal Revenue, after examination of plaintiff's books and records, reported a tax liability of $294,412.99. A copy of this report was sent to the plaintiff on July 17, 1923. The agent did not recognize the established conference prices in his determination. He reached his conclusion by increasing the valuation of skins in process and of finished goods. Respecting the latter, he adopted the method which plaintiff had used in his original return and in his returns for prior years, —the inventory of finished goods on the basis of selling prices less selling costs, discounts and profits, and found that in the original return the selling prices adopted were much lower than prices at which plaintiff was actually selling at about that date.

6. On May 1, 1924, the plaintiff appealed to the Commissioner of Internal Revenue, accompanying the appeal with a brief, in which his objections for the most part were based on changes in the valuation of inventories of raw skins, goods in process and finished material.

The differences in the raw material and in goods in process were, according to this brief, the result of the use of the conference prices in computing the values of these inventories.

7. On September 29, 1924, the plaintiff received a communication signed by the Deputy Commissioner, per A. Lewis, Head of Division, which made reference to the appeal of May 1, 1924, and to conferences held at the Bureau relative to the 1919 income tax return as well as returns for other years. In this letter, so far as it related to the 1919 tax liability, the Deputy Commissioner stated that, in accordance with the information contained in the brief and the evidence submitted at the conference, the net income for 1919 was $49,865.42, and the correct tax liability for the same year was $8,970.20. The following paragraphs were in the letter:

"Since $345,808.82 has been assessed and $8,970.20 is the correct tax liability, there has been an overassessment of $336,838.62.

"The overassessments shown herein will be made the subject of certificates of overassessment which will reach you in due course through the office of the Collec-

tor of Internal Revenue for your district. If the tax in question has not been paid, the amount will be abated by the Collector. If the tax has been paid, the amount of overpayment will first be credited against unpaid income tax for another year or years and the balance, if any, will be refunded to you by check of the Treasury Department. It will thus be seen that the overassessment does not indicate the amount which will be credited or refunded since a portion may be an assessment which has been entered but not paid."

A certificate of overassessment for $336,838.62 was prepared and signed in the name of the Deputy Commissioner by A. Lewis, Head of the Division, but it was never forwarded to the plaintiff, and the parties have stipulated that the Commissioner of Internal Revenue subsequently refused to take the action which was in contemplation at the time the letter was sent. A copy of this certificate was in evidence and showed that it had been marked "void".

8. On March 31, 1926, the plaintiff filed a claim for refund in the amount of $250,386.24. In this claim, he states that it is made to protect the rights of the taxpayer to a refund under the provisions of Sec. 284 (g) of the Revenue Act of 1926, 44 Stat. 67, and is apparently based upon the letter of September 29, 1924, referred to in paragraph 7 above.

9. Amended claims for refund of the 1919 tax were filed by the plaintiff under dates of February 28, 1933, December 2, 1933, November 22, 1934, and February 23, 1935. The claim of February 28, 1933, was for the purpose of bringing together all the issues in the matter of overstatement of inventory values as of December 31, 1919. This claim is based principally upon the plaintiff's contention that, if the so-called conference prices were applied, there would be no tax liability. The other amendments merely add additional grounds, not important to the present inquiry, although each is consistent with plaintiff's contention, set forth fully in his claim of February 28, 1933. The last two claims sought a refund of $259,356.44.

10. In 1924, David H. Blair was Commissioner of Internal Revenue. He held office until May 31, 1929. While he was in office, the plaintiff filed three briefs subsequent to the letter of September 29, 1924. Thirteen other briefs were filed with the successors of Mr. Blair, the last being dated November 10, 1934.

11. The brief of May 1, 1924, referred to in paragraph 6, was not accompanied by any tabulation or schedule which showed how the plaintiff had applied the conference prices, referred to in the brief. If there were any such, they were not produced in evidence, and apparently the Commissioner accepted the conclusions stated in that brief respecting valuations without undertaking to re-examine the inventory. As bearing upon the finality of the action of the Commissioner, not only are the claims for refund to be considered but also the numerous briefs thereafter filed.

The first brief was filed May 5, 1925, which, so far as it concerned the closing inventory of 1919, dealt with a claimed deduction for damaged goods.

In the next brief, filed April 24, 1926, the plaintiff undertook to explain in detail how the conference prices were used in valuing his inventory. Obviously, this brief was submitted in response to a request for further information respecting the closing inventory.

Again, on October 24, 1933, a brief was filed which purported to apply the conference prices under the personal supervision of the plaintiff himself, and to this brief were annexed schedules showing how the various lots of skins, raw and in process, were classified and valued according to plaintiff's interpretation of the conference report, with full explanatory notes relative to such classification and valuation.

Some of the other briefs relate to quantities and others to particular items in question.

12. By letter, dated January 2, 1928, the Assistant Secretary of the Treasury advised the plaintiff that the general question of the proper December 31, 1919, inventory for goatskins was before the office of the general counsel where it was receiving careful consideration in connection with other claims. In this communication, the plaintiff was further advised that whatever decision was reached would be applied uniformly to all cases affected. "The question involved being a general one, however, and not applicable to your case alone, it has been necessary to withhold final decisions until all taxpayers who would be affected by a decision and who wish to be heard, have been given an opportunity to present their views."

It is quite evident that plaintiff encountered further difficulties subsequent to

this date, because the thirteen briefs, referred to in paragraph 10, were filed thereafter.

13. With all the information furnished by the plaintiff in the briefs, schedules and computations, supplemented by books, invoices and records of plaintiff, the Bureau of Internal Revenue undertook to make a determination in response to the several pending claims for refund. The plaintiff received from the Deputy Commissioner a letter dated March 25, 1935, which referred to the several claims for refund. It noted the contention of the plaintiff that the closing inventory, reported in his original return for the year 1919, had been grossly overstated, if considered in the light of the conference agreement. To this contention the Deputy Commissioner replied as follows: "The issues raised in these claims including those relating to inventory valuation as of December 31, 1919, * * * have been carefully considered, and it is ascertained that, contrary to your contention, your original return for the year 1919 reflects a serious understatement of taxable net income for that year, even after taking into consideration the very low established 'market values' as of December 31, 1919, as fixed in the conference memorandum of May 16, 1922, * * *"

This letter further advised the plaintiff that the many phases involved were treated separately in detailed schedules and comments thereon which would be forwarded later and, on the basis of these findings, the Bureau proposed to disallow the claims.

14. The promised detailed schedules and comments were submitted in a 487-page communication, written under date of May 7, 1935. In this document it is distinctly stated that the schedules were prepared on the basis of inventory values as of December 31, 1919, which "reflect the exceedingly low 'established market values' named in the conference memorandum of May 16, 1922." Schedule No. 16 showed the revised valuation based on the conference prices, and a comparison with cost and with the values claimed in plaintiff's briefs. There were also schedules showing the landing, or transportation, costs.

Not only did the Bureau show by schedules and tabulations how the conference prices were applied, but over 400 pages of the letter were devoted to an exposition of the reasons for the conclusions which had been reached. The letter as a whole was a most thorough and exhaustive analysis of the inventory based upon an abundance of material.

15. The communication described in the preceding paragraph was the last official action taken by the Bureau prior to suit, which was brought February 19, 1938, although at least five conferences between representatives of the plaintiff and of the Bureau were held between August, 1935, and February 14, 1938.

Subsequently, on September 26, 1938, the Bureau made another redetermination of plaintiff's tax liability and found it to amount to over $1,000,000. In this determination the conference prices were apparently disregarded.

I do not find it necessary to decide whether, or to what extent, this belated determination should be taken into consideration. For the purposes of this case, it will be sufficient to consider the last official action prior to suit, which was the letter of March 25, 1935, followed by the letter of May 7, 1935, which advised the plaintiff that his several claims for refund would be rejected.

In my findings, therefore, I will proceed to a consideration of the values placed upon plaintiff's closing inventory in the letter of May 7, 1935, for the purpose of determining whether the Bureau's action was arbitrary or illegal.

16. Before considering the matter of valuation, it will be necessary to dispose of a controversy which has arisen between the parties as to whether 13 lots of goatskins should have been included in the inventory. Of these 13 lots, the government concedes as to 8 of them that the purchase advices received by the plaintiff were dated prior to December 31, 1919. These were lots 780, 804, 808, 814, 845, 861, 864 and 865.

Respecting the remaining lots, viz: Nos. 733, 876, 887, 888 and 896, the evidence is not sufficient to sustain the plaintiff's burden of proving that these lots were purchased before December 31, 1919.

If the contracts which the plaintiff entered into during 1919 for the purchase of the skins were specific and covered ascertained goods, there would be no doubt that the title passed to the plaintiff at the time of the purchase advices, according to the usages of the trade. That would be the time when, according to the intention of the parties to the contract, the title was to pass. The evidence, however, falls short of establishing the fact that these contracts were for ascertained goods.

Respecting the 13 lots, therefore, I find that the plaintiff has not sustained his burden of proving that title to the skins had passed to the plaintiff before the end of the year 1919.

17. In the letter of May 7, 1935, the Bureau took the plaintiff's first return as a basis. This return showed a net income subject to surtax of $559,444.13. From this sum was deducted $159,381.68 and added $661,073.98, making a net increase of $501,692.30. Many of the items making up the increase and the decrease are not in dispute. The Bureau deducted $152,884.02, being the amount by which its valuation of the raw skins was less than the valuation put upon them by the plaintiff, in his original return. The amount of this deduction presents one of the important issues of this trial.

The other items in dispute relate to an over-statement of the amount of merchandise bought for sale during 1919 and to an increase in valuation of skins in process and finished goods over values reflected in the original return.

18. First, taking up the matter of differences in value of raw skins, the plaintiff introduced evidence tending to show the actual market value as of December 31, 1919, of these skins, and also tending to show the established market prices reached by applying the conference prices. Compilation of the results were, for the convenience of the Court, received in evidence as "schedules". These valuations so far reduced the inventory that, after deducting claims for damages, a loss is shown instead of gross income. As above indicated, I shall consider the evidence bearing upon the inventory values only so far as it relates to the established conference prices applied in accordance with the conference agreement.

19. While the schedules of plaintiff's witness and the letter of May 7, 1935, both purport to state values reached by applying the same basis for determining market prices, they present widely different results. According to the plaintiff's claim, if the conference prices are properly applied, the total valuation of the raw skins, after excluding the lots referred to in paragraph 16, amount to $1,406,227.27. According to the Bureau's letter, these same skins, valued on the basis of the conference prices, should be inventoried at $1,866,314.13.

20. It is obvious that this wide difference is due to several factors. First, and most important, is the fact that the plaintiff classifies a considerable quantity of skins in a class as to which the conference report has fixed a much lower price than that applied to the class adopted by the Commissioner for comparative purposes. Other differences are explained by a different method of grading the skins within their several types. The issue of fact presented is whether the classification and grading adopted by the tax Bureau is so obviously inconsistent with the conference report that the Bureau's action can be said to be arbitrary and unfair and without substantial basis.

21. Without undertaking to deal with all of the many classes of skins entering into the inventory, it will be sufficient to select the skins concerning which there is the greatest variance.

### Raw Skins.

| | Quantity | Letter of May 7, 1935. | Plaintiff's Witness. | Differences |
|---|---|---|---|---|
| Harrar | 1,200 | $ 1,434.89 | $ 535.50 | $ 899.39 |
| Mombassa | 62,400 | 91,755.30 | 29,469.87 | 62,285.43 |
| Cape Town | 12,576 | 34,132.72 | 12,318.32 | 21,814.40 |
| Algoa Bay | 47,350 | 97,447.94 | 33,564.06 | 63,883.88 |
| Kaffir | 25,311 | 28,039.37 | 9,778.85 | 18,260.52 |
| Karachi | 5,000 | 6,922.37 | 6,225.00 | 697.37 |
| N. W. Dry Salted | 15,000 | 19,430.00 | 18,250.00 | 1,180.00 |
| Sind/Punjab | 9,724 | 9,385.34 | 5,346.40 | 4,038.94 |
| Bogotas | 4,604 | 6,253.69 | 3,596.16 | 2,657.53 |
| Payta | 5,200 | 9,654.28 | 5,551.44 | 4,102.84 |
| Mogadors | 23,724 | 36,822.09 | 12,000.39 | 24,821.70 |
| Casa Blanca | 17,471 | 22,339.25 | 8,837.42 | 13,501.83 |
| Muscat | 9,600 | 14,726.51 | 8,664.00 | 6,062.51 |
| | 239,160 | $378,343.75 | $154,137.41 | $224,206.34 |

22. Before endeavornig to find the reasons for these differences, it is necessary to make further reference to the conference report. In this report, it is stated that "it was decided that it would be unnecessary to determine a price on every different grade of skin that was shipped to this country and which would likely be found in the inventories of those dealing in the same. * * * It was explained that the government had issued a maximum price list of such skins during the war period, which would give the relation in percentage that one grade of skin bore to another, and it was agreed that the same relations were applicable at December 31, 1919. It was then agreed that a standard or representative skin would be selected from each group and a price established for it and that the same relation the other skins in that group bore to the selected grade, as shown by the government maximum price list, would be the price of these."

Then followed a list of standard grades for their respective groups, and prices opposite each were accepted as representing the fair market value as of December 31, 1919, for the average run of skins of each grade. The following designated skins and prices are pertinent:

Rivers .................... $7.75 per doz.
ChowChings ............. 8.00 " "
Coros .................... .70 " lb.
Tampicos ................ .70 " "
Cordovas .............. 14.50 " doz.
Arabian skins—the relation they bore to Coros in the government maximum price list.

The use of the relationship of a skin to the standard skin of the group as shown by the government maximum price list was explained.

From the government's maximum price list attached to the report, it will be sufficient to refer to what appears under the heading of "Africa" where, under this heading, the government lists North African, and as Arabian and Red Sea District skins the following: Abyssinian, Harras, Berberos, Mombassa, and as Capes—Capetown, Algoa Bay and Kaffirs, and the maximum prices of these various skins per pound and/or per dozen is given.

This government maximum list also prices Bogotas and Paytas. These skins were not among the skins selected by the conference.

23. The plaintiff compares Mombassa and Harras with Rivers, which is one of the lowest priced skins in the conference schedule. These are specifically named as Arabian and Red Sea skins in the government maximum price list, and there would seem to be no justification found in the conference report or in the G.M.P. list for the plaintiff's classification of these skins as Rivers. It may be that the trade would so classify them and that the plaintiff's witness would do the same, having regard to the quality of the skin, but since we are dealing with established market prices, as laid down by the conference, they must control. Since the plaintiff is insisting upon a closing inventory based on the conference memorandum, he cannot now be heard to say that the conference prices are too high or the classification of the G.M.P. list was wrong.

24. The plaintiff's witness compared Capetowns, Algoa Bays and Kaffirs with Chin Chow, a skin from China, although in earlier briefs plaintiff had suggested that they be compared to Tampicos, and had properly classified them as African skins. These skins were not named in the conference report, but in the G.M.P. list they were classified as African skins, and maximum prices were given for each type. Here again was not only the Bureau justified in its comparative price, but there is nothing in the conference report or in the G.M.P. list that gives any basis for comparing them with Chin Chows.

25. Both the plaintiff and the Bureau classified Karachi, N. W. Dry Salted, and Sind/Punjab as Amritzars, which were priced in the conference memorandum. Plaintiff reaches his result by taking anywhere from 10% to 50% from the established conference prices for Amritzars. In valuing Amritzars, there is a wide range for grading the skins within the type, and the conference report provides for this. The different results reached in appraising these skins were due apparently to the adoption of different grades. The plaintiff's witness obviously paid less regard to the provisions of the conference report than did the Commissioner. Moreover, some of these skins were of inferior quality and were bought as inferior skins, so that the cost would be lower than market. In such cases, apparently the Bureau valued the skins at cost.

26. Bogotas and Paytas were compared by the plaintiff's witness with Cordovas,

while the Bureau compared them with Coros. Except that these two skins are priced in the G.M.P. list, there is nothing in the conference memorandum to guide one in arriving at comparative prices, but the prices adopted by the Bureau would seem to be consistent with the 1918 maximum prices which were lower than December, 1919, prices.

27. Bureau compared Mogadors and Casa Blanca with Amritzars. Plaintiff uses Rivers as the comparative skin. It was stated in the letter of May 7, 1935, that, acting on the opinion of skin brokers and dealers, the Bureau had, in other cases, treated these skins comparable with Amritzars. They originated in Africa, and not in China.

28. To some extent the difference in total results may be traced to the fact that in the trade certain skins are priced on the basis of the 1200 lb. bale standard whereas in the letter of May 7, 1935, the 1,000 lb. bale standard was adopted. There can be no doubt that the conference report, read in connection with the G.M.P. list, used as a basis the 1,000 lb. bale. The Bureau's action in this respect was proper.

29. It is unnecessary to prolong this opinion by dealing further with the discrepancies between the plaintiff's schedules and the Bureau's letter respecting the value of the raw skins. It may generally be observed that, in applying conference prices where the classification and grading was not open to different interpretations of the conference memorandum, the parties agreed; but where the application involved interpretation they disagreed.

After giving full consideration to the plaintiff's testimony at the trial and to the extended explanations contained in the letter of May 7, 1935, I have reached the conclusion that, so far as concerns the valuations of the raw skins, the valuations of the Bureau, as set forth in the letter, can not be disturbed. They were based on adequate information. They were reasonably consistent with the established market prices as determined by the conference in 1922, and they cannot be said to be either arbitrary or discriminatory.

30. The next disputed items increase the taxable income. The first to be considered is the over-statement in the amount of merchandise bought for sale during the year 1919. The over-statement was due to the elimination of lots of raw skins which were included in the original return but which were excluded by the Bureau. Plaintiff concedes that 22 of these lots should not have been included, and in paragraph 16 I have found that other lots should not have been included. I gather from the explanations in the letter of May 7, 1935, that the 22 excluded lots were inventoried at $226,530.47. The bureau found from plaintiff's books and records that, after correcting exchange adjustments, the over-statement was $434,329.75. It is not necessary to decide whether the over-statement is to be measured by the cost of the disputed lots or by the value placed upon them in the original return. For the purposes of the case, we may accept the figures most favorable to the plaintiff and consider that the amount of the purchases during 1919 is to be reduced to the extent of $277,231.09, the inventoried value of all lots excluded.

31. The Bureau also increased the net income $99,822.27 by increasing the inventory valuation of 514,166 skins in process, including the cost of manufacturing as stated by the plaintiff in his briefs. There can be no doubt that the increase is due to the different application of the established conference prices to these skins.

Many of these differences have been considered already. Abyssinian and Berberahs have not been mentioned. There is a substantial difference between the parties with respect to the established value of these skins. Plaintiff classed them as Rivers, whereas in the conference report and the G.M.P. list they were clearly classified as Arabian and Red Sea. The Bureau so treated them. For the reasons stated above the valuations adopted by the Bureau will not be disturbed.

32. The other disputed item of increase is due to the increased valuation of the finished leather. The Bureau adopted the results of the agent who examined the plaintiff's books in 1923 and increased plaintiff's income $46,436.40.

This determination of the Bureau, however, must be modified by the stipulation which the parties have filed in the case. It is now agreed that it is possible to identify by lots 138,035 skins in addition to the 514,166 skins, referred to in the preceding paragraph. These skins were within 25 cents per dozen, expressed in proportion of cost, of being finished. These skins, valued on the basis of conference report, as applied by the plaintiff's witness, amount in the aggregate to $73,-

651.04. There is no substantial disagreement between the parties as to the established market values of these skins except as to San Domingo and Haitian, and, these being grouped, it is impossible to determine what the value of these skins would be if the conference prices were applied as they were applied in the letter of May 7, 1935. However, the difference cannot be of controlling importance, and for the purposes of the case I will accept the valuation of the plaintiff's witness and add the amount to the valuation of other skins in process, as found by the Bureau.

33. In the stipulation, already referred to, it is further agreed that the finished goods inventory aggregate comprised nearly 3,000 dozen skins which were finished, salted and graded and were selling, in December, 1919, and January, 1920, at prices which would aggregate for the lot, if said lot were sound and salable merchandise, selling expenses and profits eliminated, $78,000.

34. Without undertaking to determine the exact amount of plaintiff's taxable income, a summary of my findings enable me to reach the approximate results shown in the following computation:

35. The conclusion that the plaintiff has not overpaid his tax is fortified by evidence, clearly demonstrating that the established conference prices were substantially lower than the current bid prices, as reflected in plaintiff's purchases and sales around the end of the year 1919, and lower than actual market prices, as shown in trade publications. Except in a few instances, the established conference price was lower than cost and, in these instances, the Bureau, in its letter of May 7, 1935, apparently took these lots at cost.

36. In May, 1919, a strike was called at the plaintiff's plant which necessitated the employment of inexperienced labor. There can be no doubt from the evidence, and the defendant concedes, that, as a result of the interruption in operations and because of the unskilled labor, plaintiff sustained a loss with respect to the skins in process during the months intervening between May and October, 1919.

Plaintiff now claims a deduction for damages caused by the strike in the aggregate amount of nearly $200,000, and for a lot of skins that arrived after 1919 in a damaged condition. No deduction for this lot was allowed, or allowable, since it was

Computation of Net Taxable Income.

| | | |
|---|---|---|
| Gross Sales (no change) ..................................... | | $8,881,000.34 |
| Cost of Goods Sold: | | |
| Labor (no change) ............................ | $ 433,324.21 | |
| Material and Supplies (no change).............. | 200,978.01 | |
| Merchandise bought (revised) ................... | 9,481,514.84 | |
| Other costs (no change)........................ | 36,182.91 | |
| Inventory 12/31, 1918 (no change)............. | 607,768.30 | |
| Total .................................. | $10,759,768.27 | |
| Less Inventory 12/31, 1929: | | |
| Raw Skins (revised)......................... | 1,866,314.13 | |
| Landing Costs on Raw Skins.................. | 71,075.50 | |
| Skins in process (including landing costs, labor and manufacturing expenses—revised by Bureau) ...................................... | 753,084.40 | |
| 138,053 skins finished to process................. | 73,651.04 | |
| Finished goods (stipulated)..................... | 78,000.00 | |
| Supplies (no change).......................... | 13,200.00 | |
| Total .................................. | $ 2,855,325.07 | |
| $10,759,768.27—$2,855,325.07 .................................. | | $7,904,443.20 |
| Net income from business .................................. | | $ 976,557.14 |
| Other income conceded by plaintiff....................... | | 19,142.93 |
| | | $ 995,700.07 |
| Less deductions conceded by defendant.................... | | 6,497.66 |
| Total net income ..................................... | | $ 989,202.41 |

not shown that the loss was established in 1919. As to the strike damage, the original return was not filed until August, 1920, when plaintiff must have been aware of the damage, and it is not unreasonable to suppose that it was taken into account in valuing the skins in process and the finished leather. This supposition is strengthened by the fact that, in 1923, the field agent increased plaintiff's original valuation of both skins in process and finished goods as stated in paragraph 5, and by the evidence before me that more skins went into process than into the inventory. The evidence, now relied upon to show the extent of this damage, is extremely unsatisfactory. Too much is left for estimates, assumptions and conjecture, and all this twenty years after the event when witnesses apparently rely upon memory. So far as there are records, they do not lend support to recollections. The Bureau, in the exercise of its administrative power, did not see fit to allow any deduction for such damages. I cannot find that its action was so arbitrary as to warrant the Court in reversing the decision. However, this question is not important because plaintiff has paid a tax on income of less than $450,000, and the government is barred from further assessment or collection.

It follows, therefore, that if plaintiff is allowed a deduction sufficient to cover his most extravagant claims, his taxable income would not be sufficiently reduced to result in any overpayment of tax. For that reason, there is no occasion for further consideration of this aspect of the case. For the same reason, I deem it unnecessary to deal with the disputed right of the Bureau to add to the inventory of skins in process a sum to cover wastage.

The Revenue Act of 1918 (Sec. 203) provided that "whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income." 40 Stat. 1060.

Pursuant to this statute, the Commissioner promulgated regulations relating to inventory, from which the following excerpt may be deemed pertinent:

"Art. 1581. *Need of Inventories.*— * * * Only merchandise, title to which is vested in the taxpayer, should be included in the inventory. * * * A purchaser should include in inventory merchandise purchased, title to which has passed to him, although such merchandise is in transit or for other reasons has not been reduced to physical possession, but should not include goods ordered for future delivery, transfer of title to which has not yet been effected. * * *

"Art. 1582. *Valuation of inventories.*— The act provides two tests to which each inventory must conform: (1) It must conform as nearly as may be to the best accounting practice in the trade or business, and (2) it must clearly reflect the income. It follows, therefore, that inventory rules can not be uniform, but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. * * *

"The basis of valuation most commonly used by business concerns and which meets the requirements of the revenue act is (a) cost or (b) cost or market, whichever is lower. * * *

"In respect to normal goods, whichever basis (a) or (b) is adopted must be applied with reasonable consistency to the entire inventory. * * *

"Art. 1584. *Inventories at market.*— Under ordinary circumstances, and for normal goods in an inventory, 'market' means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer, * * *."

The defendant has raised a question as to the legality and propriety of applying to the plaintiff's inventory the established values fixed by the conference memorandum. It will be noted in this memorandum that the conference was called for the purpose of determining "current bid prices" for different grades of skins, as of December 31, 1919.

In Article 1584 of the Regulations, approved March 3, 1922, the Commissioner recognized "that in the latter part of 1918, by reason among other things of governmental control not having been relinquished, conditions were abnormal and in many commodities there was no such scale of trading as to establish a free market."

I can readily agree that inventories, for tax purposes, are not used to measure the wealth of the taxpayer, but rather they are used to find the cost of goods sold during the taxable period in order to determine the profits derived from the sale. I also agree that authorized regulations have the force of law, but when these regulations permit a taxpayer to elect, as a basis of valuations, costs or market, whichever is lower, it would follow, in my opinion, that the Commissioner could, in administering the law and the regulations, adopt a uniform basis for arriving at market prices in a certain industry or trade; especially if, due to abnormal conditions, the current bid prices were uncertain or unascertainable.

Obviously, an abnormal situation had arisen with respect to the tanning industry which materially and adversely affected the market values and current prices, and if the Commissioner saw fit, after investigation, to adopt established market prices in the evaluation of inventories of all those engaged in that particular industry, it would seem to me to be a laudable endeavor to apply uniformly the tax laws of the Federal government.

I find nothing, in cases cited by the defendant, that requires the conclusion that the established conference prices were illegal, even though some successor might deem them lower than actual market prices. I hold that the plaintiff is justified in insisting that his inventory be valued consistently with the conference memorandum. Any other course would be deemed discriminatory, arbitrary and manifestly unfair. Arkwright Mills v. United States, D. C., 27 F.2d 550.

If all consideration of equity and fair dealing were to be laid to one side, there might be something said for the legalistic views which learned counsel for the defendant has urged upon the Court and which would deny to the plaintiff the right to have the Commissioner apply, in measuring his closing inventory for 1919, the same yardstick which had been used in valuing 1919 inventories of other taxpayers engaged in a similar business.

It is not necessary, however, to decide whether these views should prevail since the plaintiff has underpaid his tax, if the established conference prices are adopted as "current bid prices."

Several questions of law have been raised by the plaintiff which deserve consideration. The first arises from my finding that the title to 13 lots of skins had not passed to the plaintiff prior to December 31, 1919. The question when the title passed from seller to buyer must be controlled by the Statutes of Massachusetts. Under these statutes, trade custom or usage may be admissible to show the intention of the parties when the contract is to sell specific, or ascertained, goods. Annotated Laws of Massachusetts, ch. 106, Secs. 19 and 20.

There was evidence of a custom in the trade to the effect that title passed when an offer was accepted by the buyer, but since the plaintiff's evidence, even though standing uncontradicted, did not sustain his burden of showing that the lots in question had been ascertained, or set apart, prior to December 31, 1919, the custom cannot be invoked. The Commissioner properly excluded the lots.

The next question presented is whether the valuation put upon the raw skins and skins in process, by the Bureau, based on established conference prices, should be upheld. Comparatives were necessary because of the incompleteness of the conference memorandum. The Bureau interpreted this report to mean that where the conference did not fix the price of a particular skin, that skin was to be located in a group in the G.M.P. list, and its price was to be "in the same relation" as the other skins in that group bore to the skins selected for agreed pricing.

The interpretation placed upon the conference memorandum by the Bureau is entitled to much presumptive weight. Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010; Francisco Sugar Co. v. Commissioner of Internal Revenue, 2 Cir., 47 F.2d 555, 557; Finance & Guaranty Co. v. Commissioner, 4 Cir., 50 F.2d 1061.

In the Lucas case, Mr. Justice Brandeis observed [280 U.S. 445, 50 S.Ct. 203]: "Much latitude for discretion is thus given to the administrative board charged with the duty of enforcing the act. Its interpretation of the statute and the practice adopted by it should not be interfered with unless clearly unlawful."

And in the Finance & Guaranty Co. case the Court said [50 F.2d 1062]:

"Where a statute commits to an executive department of the government a duty requiring the exercise of administrative discretion, the decision of the executive department, as to such questions, is final and conclusive, unless it is clearly proven arbitrary or capricious, or fraudulent, or involving a mistake of law."

■ The interpretation of the Bureau was far from being arbitrary or capricious. In my opinion, it was the correct interpretation. To contend that the presumption in favor of the administrative action is overcome by testimony of an expert who proceeds upon a different interpretation of the conference report, is to urge upon the Court a proposition which cannot be accepted as sound.

■ Evidence offered by the plaintiff challenging the correctness of the Bureau's valuation does not control when there is substantial evidence to support the determination of the Bureau. Crowell v. Commissioner, 6 Cir., 62 F.2d 51; United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347; United States v. Mitchell, 271 U.S. 9, 46 S.Ct. 418, 70 L.Ed. 799; Wickwire v. Reinecke, 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184; Williamsport Wire Rope Co. v. United States, 277 U.S. 551, 48 S.Ct. 587, 72 L.Ed. 985; Lucas, Com'r v. American Code Co., supra.

■ In the case at bar, there was ample evidence before the Bureau to warrant its conclusions. They had the conference report, the briefs of plaintiff and his books and records. Much of this evidence was also before the Court. In the light of this evidence, the testimony of plaintiff's expert fails to carry conviction.

■ I cannot rule on the evidence before me that the plaintiff has overcome the presumption in favor of the correctness of the Bureau's determination of plaintiff's taxable income. Moreover, the issue is not whether this determination is correct but whether plaintiff has established his claim for refund by adequate evidence. Reinecke v. Spalding, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385.

■ Another reason, if another is necessary, for sustaining the Bureau's valuation, is that the statute and regulations contemplate that the inventory shall clearly reflect income. It has been said that "if, as between two possible methods, it were a matter of uncertainty which gave the truer reflection, it would be within the discretion of the commissioner to choose; and we would not and could not review that discretion." Rookwood Pottery Co. v. Commissioner, 6 Cir., 45 F.2d 43, 46. Clearly, the Bureau's application of the conference prices to plaintiff's inventory more nearly reflected income because they more nearly approached cost or current bid prices than did the market values adopted by plaintiff's witness.

■ The plaintiff has argued that the letter of September 29, 1924, which he received while Commissioner Blair was in office, was a final determination which could not be disturbed by his successor, relying upon Woodworth, Coll., v. Kales, 6 Cir., 26 F.2d 178. Plaintiff concedes, however, that while Commissioner Blair was in office the tax liability of the plaintiff could have been reconsidered, notwithstanding the letter from the Commissioner. See Page v. Lafayette Worsted Co., 1 Cir., 66 F.2d 339. As I view the facts, that is exactly what happened because the certificate of overassessment was never sent and, in response to requests for further information, several briefs were filed before Blair was succeeded by another commissioner.

Furthermore, it may be significant that when this certificate was signed there was not then pending before the Bureau any claim for a refund of any such amount as the overassessment stated in the letter. It was not until 1926 that a claim for refund of overpayment, due to the failure to adopt conference prices, was first filed. Commissioner Blair was then in office, and it cannot be maintained that he took final action on this claim, or any other refund claim, while he was in office. The real situation was that when Commissioner Blair resigned, the question of plaintiff's tax liability was still pending, and it was not only the right but the duty of his successor to proceed to a final determination of the matter. The right of a commissioner to re-audit and redetermine a taxpayer's liability after claims for refund have been filed is now firmly established. Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293; United States v. Memphis Cotton Oil Co., 288 U.S. 62, 53 S.Ct. 278, 77 L.Ed. 619. It has been held that a commissioner, who signed a schedule of refunds and credits and sent it to the collector together with a check to be delivered to a taxpayer for the making of a refund entered on the schedule, retained the right

to revoke his action before delivery to the taxpayer. Daube v. United States, 289 U. S. 367, 53 S.Ct. 597, 77 L.Ed. 1261. See United States v. Wurts, 303 U.S. 414, 58 S. Ct. 637, 82 L.Ed. 932.

With respect to plaintiff's claim for deductions for damages while, as already pointed out, this issue is not vital, I will observe only that plaintiff's profits for the year 1919 were considerable, if properly determined, and they may not be reduced by losses not realized during that year. Weiss v. Wiener, 279 U.S. 333, 335, 49 S. Ct. 337, 73 L.Ed. 720.

█ The tax is computed upon an annual accounting period, and losses in a lean year cannot be thrown back to offset the profits of a prosperous year. Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 50 S.Ct. 263, 74 L.Ed. 848.

Judgment to be entered for the defendant.