\*FRUEHAUF TRAILER COMPANY, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 88221, 89949. Filed April 13, 1964.

———

\*By Court order dated Oct. 12, 1964, the name of petitioner was changed to "Fruehauf Corporation."

84

*Raymond C. Cushwa* and *George D. Webster,* for the petitioner.
*George J. LeBlanc* and *Leo A. McLaughlin,* for the respondent.

ARUNDELL, *Judge:* In these consolidated proceedings respondent, in docket No. 88221, determined deficiencies in income tax for the

calendar years 1954 and 1955 of $2,955,903.12 and $3,717,622.52, respectively, and, in docket No. 89949, a deficiency in income tax for the calendar year 1956 of $3,296,142.33.

In an amended petition filed in docket No. 88221, "Petitioner also contends that its income taxes for 1955 are overpaid by the amount of $5,632,533.86."

In its petition and amended petition filed in docket No. 89949, "Petitioner also contends that its income taxes for 1956 are overpaid by the amount of $251,732.90, or such greater amount as may be legally refundable plus interest thereon."

In an amendment to answer to amend petition filed in docket No. 88221,[1] respondent makes claim for an increased deficiency for the year 1955 pursuant to the provisions of section 6214(a), I.R.C. 1954.

In an amended answer to the amended petition filed in docket No. 89949, respondent, in the alternative, affirmatively alleges certain facts concerning the acquisition of assets of the Strick Co. and, to the extent that this might result in an increased deficiency for 1956, respondent makes claim for such increased deficiency for 1956 pursuant to the provisions of section 6214(a) of the 1954 Code.

Two issues relating to certain capital gains and to a bad debt have been dropped by petitioner. All other issues, except one, have been settled by stipulations of the parties and effect will be given thereto under Rule 50. The one remaining issue is whether the respondent erred in determining that all used trailers acquired by petitioner as trade-ins or on repossession during the taxable years and still on hand at the close of the year should be included in the inventory at the lower of cost or market rather than at $1 per trailer.[2]

The evidence consists of four separate stipulations (three with attached exhibits), oral testimony, and additional exhibits received at the hearing.

### FINDINGS OF FACT

The stipulated facts are so found and are incorporated herein by this reference.

---

[1] Respondent herein alleges that he erred in his computation of the deficiencies for 1954 and 1955 by improperly valuing 172 used trailers included in the closing 1954 (and the opening 1955) inventory at $308,860.87; that these 172 trailers were acquired prior to Jan. 1, 1954, and were carried in the closing 1953 (and the opening 1954) inventory at $172 for Federal income tax purposes; that pursuant to the provisions of sec. 1013, I.R.C. 1954, and the regulations thereunder, these 172 units should have been valued, for income tax purposes, at $1 each in the closing 1954 (and the opening 1955) inventory; that all of the 172 units were sold in 1955; and that the correction of this error will result in a lesser deficiency for 1954 and an increased deficiency for 1955.

[2] Prior to Jan. 1, 1954, for Federal tax purposes petitioner's used trailers received as trade-ins or on repossession were carried in the inventories at $1 for each trailer although, as of Jan. 1, 1949, petitioner had adopted the policy of valuing such trailers on its books at the lower of cost or market basis and has continued such policy to the present time.

Petitioner is a corporation which was incorporated under the laws of the State of Michigan on February 27, 1918. Its principal office is now, and has been since its organization, in Detroit. Its income tax returns for the periods involved in the instant proceedings were filed with the district director of internal revenue for the district of Michigan.

Petitioner has kept its books and filed its income tax returns on the accrual method of accounting for each calendar year.

Since its incorporation petitioner has been primarily engaged in the business of manufacturing and selling commercial truck trailers. Beginning during the last few months of 1954, it has also engaged in leasing new and used truck trailers.

In its early years petitioner manufactured commercial truck trailers only a special-order basis, each trailer being built to meet the specific requirements and specifications of the customer, and it did not acquire any used trailers. Commencing about the year 1926, petitioner began to acquire used trailers as trade-ins on the sale of new trailers, and it also began to acquire some used trailers by repossession. The amount allowed the customer for a trade-in was a sales device, and involved a discount on the price of the new trailers and did not represent either cost or market value.

During the years 1942 through 1948 petitioner also purchased used trailers for resale in transactions not involving the sale of a new trailer, and such trailers on hand at the end of the respective years were included in used trailer inventories at the lower of cost or market for both book and income tax return purposes. There is no controversy as to these trailers.

During the taxable years 1954, 1955, and 1956, petitioner also acquired used trailers by purchase in transactions wherein new trailers were sold to the vendors thereof.

During the first several years when petitioner took used trailers [3] as trade-ins, the trailers were of the homemade variety which had been made by nonestablished manufacturers. They were heavy units with wooden bodies, wooden wheels, solid tires and many were unsafe for highway use, and State and municipal authorities would not permit them to be operated. In many cases the frames had to be scrapped and the bodies burned. Often the cost of cutting up the frames was more than the amount which could be obtained from a junk or scrap dealer.

In the 1920's the trailer industry was in its infancy; the idea of using trailers for transportation was new, and the industry had not been developed to any substantial extent. Until the latter part of the

---

[3] Hereinafter, the term "used trailers" refers only to those used trailers acquired as trade-ins or as repossessions, unless otherwise specified.

1930's, trailers were built tailor made to the customers' specifications, and there was practically no standardization.

In the 1920's trailers were 14 to 16 feet long. As time went on, with the advent of more powerful tractors and better highways, the State laws as to permissible trailer lengths were continually changing, permitting longer trailers, with the result that trailers could become obsolete overnight, and many used trailers taken by petitioner as trade-ins or by repossession were obsolete.

In most cases where petitioner found it necessary to repossess a trailer which it had sold on a time contract, the customer, being in financial straits, had not maintained the vehicle properly, and it was in very poor condition.

At the time petitioner originally began acquiring used trailers as trade-ins or by repossession, resale of these units was highly uncertain and the market value of these units in inventory was incapable of determination with any degree of accuracy. When a used trailer came in, if petitioner determined that there was no possibility of selling the unit, it was scrapped. As to the rest, petitioner was uncertain whether a particular unit could be sold at all, and it was necessary to search for a customer and attempt to induce him to convert his truck to a tractor to draw a trailer. If a customer was found, the unit would be rebuilt to his specifications, and reconditioned.

Since it was impossible to ascertain with any substantial degree of accuracy the market or anticipated realizable value of a used trailer at the time petitioner first began acquiring said trailers and for several years thereafter, petitioner adopted the practice of including such used trailers in inventory on its books at $1 each. This practice was followed on its books and accounting records for all years from 1926 to and including the calendar year 1948, and was also followed in filing its Federal income tax returns for all years from 1926 to and including the calendar year 1958 with the exception of the 1948 return which was later adjusted by respondent to reflect used trailers at $1 per unit.

By the middle or late 1930's, trailers were becoming standardized to some extent and used trailers taken in by petitioner in most cases had steel bodies and were of its own manufacture or of other established companies. During the late 1930's it became possible to appraise used trailers with a considerable degree of accuracy. Until 1932 petitioner made only chassis for trailers and either sold the chassis alone or purchased bodies from a body manufacturer. In 1932 petitioner commenced the manufacture of steel trailer bodies. Until 1939 chassis and bodies were built separately but in that year petitioner commenced construction of the Aerovan in which the chassis and body were constructed as a single unit. This was the first frame integral

trailer built by the trailer industry. Its construction made for a lighter trailer permitting a greater payload.

The Internal Revenue Service examined and audited petitioner's Federal income tax returns for the years prior to 1942 and made no change with respect to petitioner's used-trailer inventories. The revenue agent who examined the 1939 return questioned petitioner's right to use the $1-per-unit practice but finally did nothing about the matter.

On April 28, 1948, there was transmitted to petitioner the revenue agent's report dated March 15, 1948, for the 4 years 1942 through 1945, which report proposed to adjust the used trailer inventory at *December 31, 1945*, from the $1-per-unit practice to the lower of cost or market value method.

Petitioner protested this report and in support thereof filed a memorandum brief with the internal revenue agent in charge at Detroit on September 7, 1948. In its protest, petitioner strenuously contended that on the ground of consistency its used-trailer inventory at December 31, 1945, should remain at $1 per unit but, if the change at December 31, 1945, be held to stand at the lower of cost or market, then similar adjustments must be made to both the opening and closing inventories of used trailers for each of the 4 years 1942 through 1945 then under audit.

At a conference at the office of the internal revenue agent in charge in Detroit on September 9 and 10, 1948, a tentative agreement was reached by petitioner with the conferee, J. J. Mannebach, whereby both the opening and closing used-trailer inventories for the 4 years 1942 through 1945 would be revised from the practice of valuing such trailers at $1 per unit to the lower of cost or market value as follows:

| Year ended Dec. 31— | Number of units | Value at $1 per unit in returns filed | Value at the lower of cost or market | Difference | Difference in net profit (or loss) |
|---|---|---|---|---|---|
| 1941 [1] | 879 | $879 | $568,108.76 | $567,229.76 | |
| 1942 | 153 | 153 | 206,768.94 | 206,615.94 | ($360,613.82) |
| 1943 | 37 | 37 | 53,785.54 | 53,748.54 | (152,867.40) |
| 1944 | 144 | 144 | 160,933.59 | 160,789.59 | 107,041.05 |
| 1945 | 759 | 759 | 678,448.94 | 677,689.94 | 516,900.35 |

[1] Opening 1942 inventory.

Petitioner and its representatives were aware at all times that the agreement reached on September 9 and 10, 1948, between petitioner and the conferee was subject to the approval of respondent's national office.

Subsequently, on November 9, 1948, petitioner executed a Form 874 agreeing to a net deficiency for the 4 years 1942 through 1945, part of which net deficiency resulted from the departure from the $1-per-unit practice of inventorying used trailers. On February 11, 1949, peti-

tioner was notified by the conference section of the office of the internal revenue agent in charge in Detroit that disposition of the case would be in accordance with the Form 874 filed on November 9, 1948, and on June 8, 1949, petitioner paid the aforementioned net deficiency.

Inasmuch as the overassessments for the years 1942, 1943, and 1944 exceeded $75,000 for each year, these overassessments were subject to review by the Joint Committee on Internal Revenue Taxation under the provisions of section 3777 of the 1939 Code. Petitioner and its representatives were aware that prior to the certification of the overassessments, they had to be reviewed by the Chief Counsel of respondent's office.

While the deficiencies set forth in Form 874 were assessed and the net deficiency was paid by petitioner on June 8, 1949, respondent never certified the overassessments as set forth on Form 874 dated November 9, 1948.

In July 1947 the committee on accounting procedure of the American Institute of Certified Public Accountants issued accounting research Bulletin No. 29 on "Inventory Pricing." Because of this bulletin and the growing importance of used trailers in petitioner's operations petitioner, in 1947 and 1948, gave very serious consideration as to whether it should change inventorying its used trailers from $1 each to the lower of cost or market. However, in view of the fact that its tax case for the years 1942 through 1945 was then pending, there was considerable reluctance to make the change at that time and on its books and in its financial reports for the years 1947 and 1948 petitioner continued to inventory its used trailers at $1 each.

Partly because of the execution of Form 874, dated November 9, 1948, which petitioner thought was a settlement of the inventory issue for the years 1942 through 1945, and partly because, in the interest of more accurate reporting of annual earnings, petitioner, as of January 1, 1949, on its books and in its financial reports, inventoried its used trailers, acquired in trade-ins or as repossessions, at the lower of cost or market. Such method of inventorying used trailers has been followed on petitioner's books of account since that time.

In the published annual report of petitioner for the year 1949, dated March 30, 1950, the following statement appears:

Prior to January 1, 1949, it had been the policy of our Company to price the inventory of used Trailers received as trade-ins or on repossession at $1.00 each. While this policy undoubtedly was a conservative one, it did have the effect of increasing reported earnings when more used Trailers were sold than were taken in, and of decreasing reported earnings when more used Trailers were taken in than were sold. This policy was particularly distorting during those periods when our sales of commercial Trailers were rapidly expanding or contracting. Accordingly, in the interest of more accurate reporting of annual earnings, we have discontinued our past policy of writing down used or re-

possessed Trailers to the nominal value of $1.00 upon acquisition, and have adopted instead a policy of carrying such Trailers in our accounts at their appraised value, less estimated costs of disposal.

In approving the financial statements contained in the annual report of petitioner for 1949, the opinion of the certified public accountants included the following qualification:

> The accounting policies of the Company and its consolidated subsidiaries for 1949 are consistent with those of the preceding year except for the change (which has our approval) in the basis of pricing inventories of used trailers as outlined in Note G to the financial statements.
>
> Note G—Used Trailers
> The accounting policies of the Company and its consolidated subsidiaries for 1949 are consistent with those of the preceding year except for the change in the basis of pricing inventories of used trailers received as trade-ins or on repossession. It had been the policy to state these trailers at $1.00 each. As of January 1, 1949, the Company adopted the policy of pricing such trailers at their appraised values, less estimated disposal costs. As a result of this change, consolidated net earnings (after federal taxes on income) for the year are $296,817 higher than they would have been under the policies of the preceding year.

On May 16, 1949, the Excess Profits Tax Council allowed petitioner's claims in part for relief under section 722 of the 1939 Code for the years 1940 through 1945. A recomputation of tax liability, in a revenue agent's supplemental report dated July 29, 1949, showed a net overassessment for the years 1940 through 1945 of $1,536,380.83. This supplemental report reflected the settlement between petitioner and the internal revenue agent in charge at Detroit on the protested issues which resulted in the execution of the previously mentioned Form 874 dated November 9, 1948, as well as the determination by the Excess Profits Tax Council on May 16, 1949.

The Internal Revenue Service files relating to petitioner's income and excess profits taxes for the years 1940 through 1945 were forwarded to the national office for the purpose of preparing the report to the Joint Committee on Internal Revenue Taxation regarding the overassessments with respect to which petitioner had executed a new Form 874 dated August 1, 1949. In the course of the preparation of this report, representatives of the Chief Counsel's office questioned the propriety of the settlement between petitioner and the internal revenue agent in charge in Detroit resulting in the first Form 874, dated November 9, 1948, insofar as the opening January 1, 1942, inventory of used trailers, acquired as trade-ins or as repossessions, was concerned. A conference was held in Washington on February 15, 1950, between representatives of the Chief Counsel's office and petitioner. No agreement was reached as a result of this conference and, on March 7, 1950, the office of the Chief Counsel returned the entire administrative file for the years 1940 through 1945 to the Income Tax

Unit in Washington with a memorandum dated March 7, 1950, stating in part as follows:

Certificates of overassessment of excess profits tax in favor of the above-named taxpayer for the years 1940 to 1945, inclusive, together with overassessments resulting from tentative adjustments, are before this office for review and for the preparation of a report for the Joint Committee on Internal Revenue Taxation pursuant to section 3777, Internal Revenue Code. * * * Since organization it has been the consistent practice of the taxpayer to inventory used trailers at $1.00 for each unit on hand at the end of each year regardless of the actual value. *The entire cost of reconditioning trailers, which is substantial, is charged to cost of goods sold in the year incurred and is not taken into account when inventorying used trailers.* Thus the taxpayer's books and tax returns show income computed on the basis of inventorying used trailers at $1.00 per unit on hand *although considerable reconditioning costs thereon had been incurred.* * * *

The revenue agent in his examination concluded that inventory of used trailers was not computed on any recognized method or in accordance with Regulations 111, Sec. 29.22(c)-2, *which requires a method that will truly reflect income,* therefore he adjusted the used trailer inventory as of December 31, 1945 *by adding thereto reconditioning costs of units on hand,* estimated by computations. The taxpayer in a protest consented to such change *provided a like revision to used trailer inventories was made beginning January 1, 1942.* Pursuant to conferee's recommendation the inventories of used trailers have been increased each year 1942 to 1945, *in accordance with the taxpayer's protest* and the proposed overassessments computed on that basis. * * *

*        *        *        *        *        *        *        *

*While taxpayer's method of computing inventories of used trailers is obviously erroneous,* it is the opinion of this office that a correction should not be made in this case in a manner that will result in the substantial benefit to the taxpayer as now proposed. * * * Unless a settlement on a more equitable basis can be reached or the correction made starting in a year where the opening inventory is small and the double benefit would not be so great (as, for instance, the year 1944), it is the opinion of this office that the Government should refuse to permit a change in the erroneous method of inventorying used trailers used by the taxpayer.

Accordingly, the entire administrative file for the years 1940 to 1945, inclusive, is returned herewith for reconsideration of the proposed revision of the used trailer inventory. * * * [Emphasis supplied.]

By letter dated May 2, 1950, the administrative file for the years 1940 through 1945 was returned by the Income Tax Unit in Washington to the office of the internal revenue agent in charge in Detroit for reconsideration. This letter stated in part:

*However, it will be noted that the reconditioning costs of $567,229.76 added to the inventory on January 1, 1942, and deducted in cost of goods sold prior to 1942 are again deducted through the inventory in cost of goods sold in 1942.* The above adjustments were not acceptable by the taxpayer unless the inventory on January 1, 1942 was increased $567,229.76 in excess of the closing inventory on December 31, 1941. * * * Inasmuch, however, as the taxpayer's position in this respect is inconsistent with the erroneous charge off of reconditioning costs in 1941 and prior years, it is the opinion of this office that the provisions of section 3801 of the Code are applicable. * * * It is further the opinion of this office that * * * section 3801 * * * may be waived if the taxpayer will, in lieu of such

redetermination, enter into an agreement providing for the inclusion in its taxable income for each of the ten years commencing with the year 1942, or the earliest year not otherwise barred by the statute of limitations, of one-tenth of the amount, which * * * would escape taxation. * * * [Emphasis supplied.]

On May 18, 1950, representatives of petitioner conferred again with Mannebach and advised Mannebach that the new proposal of a 10-year spread suggested in the above-mentioned letter dated May 2, 1950, was completely unsatisfactory to petitioner and that petitioner would insist on the original settlement under Form 874, dated November 9, 1948.

On June 13, 1950, another conference was held in Washington between representatives of petitioner and representatives of the national office of the Internal Revenue Service.

On June 20, 1950, the Deputy Commissioner of Internal Revenue addressed a letter to the internal revenue agent in charge in Detroit which stated, in part:

At a conference held on June 13, 1950 with representatives of the taxpayer, of the Chief Counsel and of this office, the inventory adjustment recommended in Bureau letter dated May 2, 1950, to which the taxpayer objected was carefully reconsidered. * * *

*The taxpayer's representatives have not made an acceptable offer whereby the double deduction created by the opening inventory for 1942, could be compensated on an equitable basis, but have indicated that recomputation of the inventories on the dollar-value basis, heretofore consistently followed by the taxpayer, would be satisfactory.*

On the basis of the above statements and on the basis of all the facts considered at the conference it is recommended that the inventories be recomputed on the dollar value basis and the net income and tax liability adjusted accordingly. [Emphasis supplied.]

On June 23, 1950, the chief conferee in the office of the internal revenue agent in charge in Detroit (P. P. Boucher) conferred with a representative of petitioner and advised that it had been decided not to disturb but to accept petitioner's used-trailer inventory of $1 per unit. It was then agreed that recomputations of tax on such basis would be made by petitioner and such recomputations were submitted on June 28, 1950. At that conference petitioner's representative informed Boucher that the method of inventorying used trailers in the books of account of petitioner had been changed in 1949 from the $1-per-unit practice to the lower of cost or market value method. He further pointed out the difference between inventory methods for book and for tax purposes would create problems in 1949 and subsequent years. Petitioner's representative supplied a copy of the 1949 annual report of petitioner, showing such change in inventory method, to Boucher.

On July 5, 1950, a revised Form 874, dated July 5, 1950, concerning the years 1940 through 1945, was executed by petitioner and delivered to the internal revenue agent in charge. So far as standard issues (issues other than those arising under section 722) were concerned, the

only change in the revised Form 874, dated July 5, 1950, from the Form 874, dated November 9, 1948, was that the opening and closing inventories of used trailers for the years 1942 through 1945 were computed at $1 per unit rather than the lower of cost or market value. On July 7, 1950, the internal revenue agent in charge in Detroit advised petitioner that the case would be disposed of in accordance with the recomputation.

On September 27, 1950, the national office of the Internal Revenue Service forwarded its report to the Joint Committee on Internal Revenue Taxation. On November 15, 1950, petitioner received a refund of $1,503,230.81 in Federal income and excess profits taxes (including interest) for the years 1940 through 1945 in accordance with Form 874 dated July 5, 1950.

On October 14, 1949, petitioner filed a claim for refund of income taxes for the year 1946. This claim reflected (apart from the other issues) the inventory of used trailers in 1946 at the lower of cost or market. Consistent with respondent's acceptance in June 1950 of petitioner's returns for the years 1942 through 1945, reflecting inventory of used trailers acquired through trade-ins or repossessions at $1 per unit, this claim was rejected on January 28, 1953.

On October 14, 1949, petitioner also filed an amended return for 1947 in which it changed its inventory of used trailers, from inventorying them at $1 each to the lower of cost or market. This was done to bring 1947 in line with respondent's action in regard to its returns for the years 1942 through 1945 as reflected in Form 874, dated November 9, 1948. However, in line with respondent's later action for the years 1942 through 1945, as reflected in Form 874, dated July 5, 1950, the respondent rejected the amended return for 1947.

In filing its original return for 1948 on June 15, 1949, petitioner inventoried its used trailers on the lower of cost or market basis. This was done to bring 1948 in line with respondent's action in regard to its returns for the years 1942 through 1945 as reflected in Form 874, dated November 9, 1948. However, in line with respondent's later action in June 1950 for the years 1942 through 1945, as reflected in Form 874, dated July 5, 1950, the respondent computed the inventories of these used trailers at $1 each so as to conform to the way in which the prior years were being settled.

On or about August 17, 1950, petitioner filed its Federal income tax return for the calendar year 1949, in which return it inventoried its used trailers on the basis of $1 each. However, petitioner indicated in its return that on its books such used trailers were valued at the lower of cost or market.

The Federal income tax returns of petitioner for the years 1950 through 1953 were filed using the $1-per-unit practice of inventorying used trailers.

The returns for the years 1949 through 1953 were examined by a revenue agent whose reports were dated October 23, 1956. The used-trailer inventory was thoroughly considered and questioned by the agent, but the $1-per-unit practice of inventorying used trailers was not disturbed.

Petitioner's returns for the years 1954 to 1958, inclusive, were filed reflecting used trailers in inventory at $1 per unit.

On March 31, 1959, the revenue agent informed petitioner that the national office of the Internal Revenue Service had decided that it could no longer go along with petitioner's practice of inventorying its used trailers and that, beginning with the trailers acquired *during 1954* the inventory would have to be computed on the lower of cost or market basis. Thereafter, on April 28, 1960, and August 29, 1960, the deficiency notices which form the basis for this proceeding were issued.

Petitioner has spent in the form of accounting fees, legal fees, allocable time of its officers, and other expenses, approximately $100,000 in the years 1942 through 1945, and approximately $250,000 in connection with the instant proceedings.

A summary for each of the years from 1936 to 1958, inclusive, of the used-trailer inventory of the petitioner is set forth as follows, showing:

(1) The number of units (used trailers) on hand at the indicated dates;

(2) The difference in inventory value between $1 per unit and the lower of cost or market; and

(3) The increase or decrease in taxable income for the year which would have been experienced had the used trailers been inventoried at the lower of cost or market value instead of at $1 each.

| Year ending Dec. 31— | (1) Number of units | (2) Difference in inventory value | (3) Increase (or decrease) in taxable income for year |
|---|---|---|---|
| 1936 | 530 | (1) | (1) |
| 1937 | 654 | (1) | (1) |
| 1938 | 564 | (1) | (1) |
| 1939 | 792 | $533,188.38 | (1) |
| 1940 | 938 | 593,251.71 | $60,063.33 |
| 1941 | 879 | 567,229.76 | (26,021.95) |
| 1942 | 153 | 206,615.94 | (360,613.82) |
| 1943 | 37 | 53,748.54 | (152,867.40) |
| 1944 | 144 | 160,789.59 | 107,041.05 |
| 1945 | 759 | 677,689.94 | 516,900.35 |
| 1946 | 730 | 740,818.82 | 63,128.88 |
| 1947 | 1,222 | 1,058,654.07 | 317,835.25 |
| 1948 | 962 | 769,974.37 | (288,679.70) |
| 1949 | 1,888 | 1,477,381.79 | 707,407.42 |
| 1950 | 1,559 | 1,525,156.29 | 47,774.50 |
| 1951 | 2,824 | 3,495,611.75 | 1,970,455.46 |
| 1952 | 2,149 | 2,555,807.08 | (939,804.67) |
| 1953 | 2,411 | 2,509,646.97 | (46,160.11) |
| 1954 | 3,600 | 5,693,285.84 | 3,183,638.87 |
| 1955 | 5,514 | 9,911,622.55 | 4,218,336.71 |
| 1956 | 9,226 | 16,250,357.81 | 6,338,735.26 |
| 1957 | 9,257 | 17,346,539.82 | 1,096,182.01 |
| 1958 | 5,049 | 8,091,701.37 | (9,254,838.45) |

1 Not available.

The number of used trailers in inventory at the beginning and end of each of the years 1940 through 1958, the number of units acquired and sold, and the dollar sales of used trailers during such years were as follows:

| Year | On hand at beginning of year | Acquired during year | Sold during year | On hand at end of year | Sales of used trailers during year |
|---|---|---|---|---|---|
| 1940 | 792 | 3,086 | 2,940 | 938 | $2,719,782 |
| 1941 | 938 | 2,955 | 3,014 | 879 | 2,119,330 |
| 1942 | 879 | 1,120 | 1,846 | 153 | 2,151,049 |
| 1943 | 153 | 1,076 | 1,192 | 37 | 2,052,883 |
| 1944 | 37 | 1,275 | 1,168 | 144 | 1,585,743 |
| 1945 | 144 | 1,870 | 1,255 | 759 | 1,477,086 |
| 1946 | 759 | (1) | (1) | 730 | 2,372,178 |
| 1947 | 730 | (1) | (1) | 1,222 | 4,447,464 |
| 1948 | 1,222 | (1) | (1) | 962 | 4,977,233 |
| 1949 | 962 | (1) | (1) | 1,888 | 6,029,577 |
| 1950 | 1,888 | (1) | (1) | 1,559 | 9,231,159 |
| 1951 | 1,559 | (1) | (1) | 2,824 | 13,662,051 |
| 1952 | 2,824 | (1) | (1) | 2,149 | 17,545,575 |
| 1953 | 2,149 | (1) | (1) | 2,411 | 18,777,363 |
| 1954 | 2,411 | 9,231 | 8,042 | 3,600 | 19,150,756 |
| 1955 | 3,600 | 17,538 | 15,624 | 5,514 | 26,878,291 |
| 1956 | 5,514 | 21,762 | 18,050 | 9,226 | 35,053,149 |
| 1957 | 9,226 | 18,286 | 18,255 | 9,257 | 39,107,050 |
| 1958 | 9,257 | 13,164 | 19,372 | 5,049 | 35,478,208 |

1 Not available.

The total sales of petitioner for the years 1926 to 1958, inclusive, as shown in its Federal income tax returns, were as follows:

| Year | Total sales | Year | Total sales |
|---|---|---|---|
| 1926 | $1,605,906 | 1943 | $56,722,544 |
| 1927 | 1,810,368 | 1944 | 65,086,642 |
| 1928 | 2,840,003 | 1945 | 63,960,408 |
| 1929 | 3,743,314 | 1946 | 66,022,495 |
| 1930 | 2,668,784 | 1947 | 72,451,883 |
| 1931 | 2,890,329 | 1948 | 74,693,003 |
| 1932 | 2,184,401 | 1949 | 77,943,886 |
| 1933 | 2,357,465 | 1950 | 131,877,217 |
| 1934 | 3,282,708 | 1951 | 161,410,628 |
| 1935 | 6,045,429 | 1952 | 162,692,443 |
| 1936 | 9,300,143 | 1953 | 193,497,076 |
| 1937 | 8,415,585 | 1954 | 152,748,961 |
| 1938 | 5,739,823 | 1955 | 234,555,798 |
| 1939 | 14,347,168 | 1956 | 253,397,959 |
| 1940 | 18,317,632 | 1957 | 227,585,667 |
| 1941 | 30,968,492 | 1958 | 207,707,310 |
| 1942 | 34,960,574 | | |

As of October 31, 1955, petitioner purchased, for cash, the assets of Hobbs Manufacturing Co. and Hobbs Trailer Equipment Co., of Fort Worth, Tex., which companies had theretofore been engaged in the business of manufacturing and selling truck trailers. Thereafter, petitioner conducted the business theretofore carried on by said companies as a separate division, known as the Hobbs Division. Among the assets so acquired by petitioner were certain used trailers in inventory which had a value (lower of cost or market) on October 31, 1955, of $105,871.15, and were carried at that amount in inventory by the Hobbs companies in their books of account and on their income tax

returns. On December 31, 1955, the Hobbs Division of petitioner had on hand in inventory 109 used trailers which were included in inventory on petitioner's books at $122,624.96 (lower of cost or market value). The Hobbs companies stated on their 1954 and 1955 income tax returns that they valued inventory at lower of cost or market.

On January 1, 1956, petitioner, in exchange for shares of its capital stock, acquired all of the assets, and assumed some of the liabilities of the Strick Co. of Philadelphia, Pa., which company had theretofore been engaged in the business of manufacturing and selling truck trailers. Thereafter, petitioner conducted the business theretofore carried on by the Strick Co. as a separate division, known as the Strick Division. Among the assets so acquired by petitioner were certain used trailers which had a value on January 1, 1956, of $1,021,805.70, and were carried at that amount in inventory by the Strick Co. On December 31, 1956, the Strick Division of petitioner had on hand in inventory 1,344 used trailers which were included in inventory on petitioner's books at $1,568,065.86 (lower of cost or market value). Prior to the acquisition, the Strick Co. carried used trailers in inventory at the lower of cost or market value both in its books of account and on its income tax returns.

The Hobbs Manufacturing Co. and the Hobbs Trailer Equipment Co. and the Strick Co. were in exactly the same business as the petitioner; namely, the manufacture and sale of truck trailers and related equipment. Since petitioner acquired the assets of those companies, the Hobbs business and the Strick business have been conducted as divisions of the petitioner, and operated in the same manner as petitioner's other manufacturing plants (of which there are 14 or more) and sales branches (of which there are over 80).

Included in the 3,600 used trailers in inventory on December 31, 1954, were 172 used trailers which had been acquired prior to January 1, 1954, the value of which was $308,860.87 at lower of cost or market, and which were included in the 2,411 used trailers in inventory as of December 31, 1953, for income tax purposes at $1 per unit. These 172 used trailers were all sold during the year 1955. Of the 2,411 used trailers in inventory as of December 31, 1953, 2,239 were sold during the year 1954.

### Ultimate Findings of Fact

Respondent was not estopped by his prior actions from changing for Federal income tax purposes petitioner's practice of inventorying used trailers acquired after December 31, 1953, from $1 each to the lower of cost or market.

Respondent was not precluded in 1959 from making the change beginning with the then open years 1954, 1955, and 1956.

The $1-per-unit practice of inventorying used trailers is a method of accounting.

The change in the inventorying of used trailers from the $1-per-unit practice to the lower of cost or market value method constitutes a change in the treatment of a material item and a change in the method of accounting.

The change in the method of accounting made in the instant case was initiated by the respondent.

The opening and closing inventories of used trailers for the year 1954 are $2,512,057.97 and $5,696,885.84, respectively.

## OPINION

Petitioner's main contention is that respondent, at the time he determined the deficiencies herein, was estopped by his prior actions from changing for Federal income tax purposes petitoner's practice of inventorying used trailers at $1 each to the lower of cost or market. In the event we should hold that respondent is not so estopped, petitioner alternatively contends (1) that respondent could only make the change prospectively and not retroactively and was therefore precluded from making any change for any year prior to 1959; (2) that in the event respondent was not so precluded, then, under section 481, I.R.C. of 1954, as amended, petitioner is entitled to exclude from gross income an amount equal to the inventory of used trailers at January 1, 1954, determined on the same method (lower of cost or market) as the closing inventory for 1954; and (3), in the event section 481 does not apply, the same result asked for under section 481 would nevertheless apply under a long line of decisions beginning with *Thomas Shoe Co.*, 1 B.T.A. 124.

As to the main contention, we begin with the recognition that estoppel against the Government should be applied with the utmost caution and restraint. *Schuster* v. *Commissioner*, 312 F. 2d 311 (C.A. 9, 1962), affirming 32 T.C. 998.

Petitioner has made a long argument and has cited many cases in support of its contention that respondent is now estopped from insisting that petitioner, beginning with the year 1954, inventory its used trailers at the lower of cost or market method. This argument and the cases cited would be more convincing if respondent were attempting to change the inventory of used trailers for any of the years prior to 1954. Respondent, however, is not revising his acceptance of petitioner's practice of inventorying its used trailers at $1 each for any year prior to the years here before us.

We have carefully examined all of the argument and the cases cited and do not think the facts offer any basis for an estoppel. The respondent at no time, contrary to petitioner's contentions, has forced

petitioner to inventory its used trailers at $1 each. From the beginning in 1926 up to the taxable years here involved, the facts show that respondent has yielded to petitioner's wishes in this regard. Neither do the facts show that petitioner has been damaged by respondent's past actions. In *Helvering* v. *Brooklyn City R. Co.*, 72 F. 2d 274 (C.A. 2, 1934), affirming 27 B.T.A. 77, Circuit Judge L. Hand said, "A party invoking an estoppel must show that he has been damaged." Petitioner, in an attempt to establish detriment, has shown that it spent approximately $100,000 in connection with the years 1942 through 1945 and approximately $250,000 on the instant proceedings. Instead of suffering any detriment we think petitioner has been benefited financially by the respondent's past actions in permitting petitioner to inventory its used trailers at $1 per unit. By so doing, millions of dollars of income have been deferred [4] to later years. One example from the facts will suffice to show how the income for one year has been deferred to later years. For the year 1951 the facts show:

| Inventory | Units | Inventory at $1 per unit | Inventory at lower of cost or market | Difference |
|---|---|---|---|---|
| Closing | 2,824 | $2,824 | $3,498,435.75 | $3,495,611.75 |
| Opening | 1,559 | 1,559 | 1,526,715.29 | 1,525,156.29 |
| Income deferred to later years | | | | 1,970,455.46 |

Of course, the result would be the opposite in a year where more used trailers were sold than were acquired, as in 1952, where the facts show that $939,804.67 more income was returned in that year than should have been returned by using the $1-per-unit practice instead of the lower of cost or market method. But in the long run the result was favorable to the petitioner.

Such deferring of income to later years has been improper. We think that to permit it was a mistake of law. Congress has made the "year" the unit of taxation. See sec. 441(a), I.R.C. 1954, which provides, "Taxable income shall be computed on the basis of the taxpayer's taxable year." See also *Virginian Hotel Corp.* v. *Helvering*,

---

[4] See p. 312 of the trancript wherein Robert D. Rowan, a certified public accountant and a witness for petitioner, testified as follows:

Q. Mr. Rowan, if Fruehauf stayed on one dollar per unit method for valuing used trailers, will any income escape taxation?

A. No, it will not.

Q. Not one dollar?

A. Not one dollar.

The COURT. But it will be deferred.

The WITNESS. It will be deferred.

The COURT. In other words, you will have use of the money instead of the Government?

The WITNESS. That is correct, your Honor.

319 U.S. 523, rehearing denied 320 U.S. 810, wherein the Supreme Court said:

Congress has elected to make the year the unit of taxation. *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359. Thus the amount "allowable" must be taken each year. *United States* v. *Ludey*, 274 U.S. 295, 304.

It was a mistake of law for the respondent to permit petitioner to continue to inventory its used trailers at $1 each after about 1942 when both petitioner and respondent were satisfied that it was obviously erroneous to pursue such a practice, because such practice was contrary to the respondent's regulations. See Regulations 111, section 29.22(c)–2, and Regulations 118, section 39.22(c)–2, both of which provide that "Taking * * * the inventory, at a nominal price or at less than its proper value" was not in accord with the regulations. See also *Dobson* v. *Commissioner*, 320 U.S. 489, wherein the Supreme Court has held it to be "a clear-cut question of law" where "applicable statutes and regulations properly interpreted forbid" a method of calculation, such as the taking of inventories in the instant case at the nominal price of $1 per unit.

Where there is a mistake of law, the respondent is not estopped to correct the mistake in a year where the statute of limitations has not run. *Automobile Club [of Michigan]* v. *Commissioner*, 353 U.S. 180, which affirmed 230 F. 2d 585 (C.A. 6, 1956), which in turn affirmed 20 T.C. 1033; *McIlhenny* v. *Commissioner*, 39 F. 2d 356 (C.A. 3, 1930), affirming 13 B.T.A. 288; *Burnet* v. *Porter*, 283 U.S. 230;[5] *Mt. Vernon Trust Co.* v. *Commissioner*, 75 F. 2d 938 (C.A. 2, 1935); *Municipal Bond Corporation*, 41 T.C. 20. Cases such as *Woodworth* v. *Kales*, 26 F. 2d 178 (C.A. 6, 1928), and *H. S. D. Co.* v. *Kavanagh*, 191 F. 2d 831 (C.A. 6, 1951), relied upon by petitioner, are clearly distinguishable from the instant case.

We hold, therefore, that the respondent is not estopped by his prior actions from changing for Federal income tax purposes petitioner's practice of inventorying used trailers from $1 each to the lower of cost or market.

Regarding petitioner's first alternative, petitioner contends that in any event the respondent is precluded from making any adjustment for any year prior to 1959 for the reason that it would be an abuse of discretion to do so. We do not think the respondent has abused his discretion when on March 31, 1959, the revenue agent informed petitioner that the national office of the Internal Revenue Service had decided that, beginning with the used trailers acquired after December 31, 1953, the respondent would no longer permit petitioner to

---

[5] In *Burnet* v. *Porter*, 283 U.S. 230, the Supreme Court said: "The court of appeals sustained the power of the commissioner upon the authority of *McIlhenny* v. *Commissioner of Internal Revenue*, 39 F. (2d) 356; and was clearly right in doing so."

inventory such trailers at $1 each on its returns when, on its books, petitioner was correctly inventorying such trailers at the lower of cost or market. Petitioner does not show in what way the respondent has abused his discretion. In its brief it says:

Having exercised his full discretion for the years 1942–1953, the respondent cannot now change that decision retroactively. His effort to do so here constitutes an abuse of discretion.

We have previously shown herein how painstakingly respondent considered the years 1942 through 1945. His decision in June 1950 was not a decision forcing petitioner to inventory its used trailers at $1. His decision in June 1950 was simply a complete surrender to petitioner's contentions made in its brief filed September 7, 1948, that its used-trailer inventory should remain at $1 per unit, a surrender made after all efforts of an equitable settlement of adjusting the January 1, 1942, inventory had failed. It was simply the final action taken for those years, which had been under consideration from the time of the revenue agent's report dated March 15, 1948.

Petitioner, in support of its contention that respondent cannot make any adjustment in petitioner's inventory of used trailers for any year prior to 1959, relies heavily upon *Lesavoy Foundation* v. *Commissioner*, 238 F. 2d 589 (C.A. 3, 1956), reversing 25 T.C. 924. In that case the Commissioner in 1951 retroactively revoked a 1945 ruling that the taxpayer was an exempt organization and assessed deficiencies for all years back to 1946. The deficiencies and penalties would have wiped out the taxpayer's assets. In reversing this Court, the Third Circuit ruled that the Commissioner had exceeded his discretion when he changed his mind as to the taxpayer's exemption making it liable for taxes so large as to wipe it out of existence. We do not think the facts in *Lesavoy* are at all analogous to the facts in the instant case. The *Lesavoy* case was distinguished in *Wolinsky* v. *United States*, 271 F. 2d 865 (C.A. 2, 1959); in *Martin's Auto Trimming, Inc.* v. *Riddell*, 283 F. 2d 503 (C.A. 9, 1960); and in *Stevens Bros. Foundation, Inc.*, 39 T.C. 93, 108, affirmed on this issue 324 F. 2d 633, 642 (C.A. 8, 1963).

The Supreme Court, in *Automobile Club [of Michigan]* v. *Commissioner*, *supra*, in holding that the Commissioner did not abuse his discretion in applying retroactively his determination that the taxpayer was not an exempt club, among other things, said:

The Commissioner's earlier rulings were grounded upon an erroneous interpretation of the term "club" in § 101(9) and thus were based upon a mistake of law. * * * It is nevertheless contended that the Commissioner had no power to apply the revocation *retroactively* to 1943 and 1944 * * *.

The petitioner argues that, in light of the 1934 and 1938 rulings, the Commissioner was equitably estopped from applying the revocation *retroactively*.

This argument is without merit. The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law. * * *

Petitioner's reliance on H. S. D. Co. v. Kavanagh, 6 Cir., 191 F. 2d 831, and Woodworth v. Kales, 6 Cir., 26 F. 2d 178, is misplaced because those cases did not involve correction of an erroneous ruling of law. Reliance on Lesavoy Foundation v. Commissioner, 3 Cir., 238 F. 2d 589, is also misplaced because there the court recognized the power in the Commissioner to correct a mistake of law, but held that in the circumstances of the case the Commissioner had exceeded the bounds of the discretion vested in him * * *. [Emphasis supplied.]

In the instant case we hold against petitioner on its first alternative contention.

The second and third alternatives will be considered together since petitioner contends that the same result should be reached under either alternative. That result is that petitioner's opening inventory of used trailers on January 1, 1954 (closing 1953 inventory), should be held to be $2,512,057.97 instead of $2,411 as reported by petitioner and as determined by the respondent.

More specifically the contentions of the parties regarding the inventory (both opening and closing) of used trailers for the 3 years here in question may be set down as follows:

| Year ended Dec. 31— | Number of trailers | Petitioner's contention | Respondent's contention |
|---|---|---|---|
| 1953 | 2, 411 | $2, 512, 057. 97 | $2, 411. 00 |
| 1954 | [1] 172 | 308, 860. 87 | 172. 00 |
| | [2] 3, 428 | 5, 388, 024. 97 | 5, 388, 024. 97 |
| | 3, 600 | 5, 696, 885. 84 | 5, 388, 196. 97 |
| 1955 | 5, 514 | 9, 917, 136. 55 | 9, 917, 136. 55 |
| 1956 | 9, 226 | 16, 259, 583. 81 | 16, 259, 583. 81 |

[1] Acquired prior to Jan. 1, 1954.
[2] Acquired after Dec. 31, 1953.

Under the second alternative, petitioner contends that under section 481 [6] of the Internal Revenue Code of 1954, as amended by the Technical Amendments Act of 1958, it is entitled to exclude from gross income as a part of the cost of goods sold for the calendar year 1954 an amount equal to the inventory of used trailers at January 1, 1954 (which is the same as the closing inventory for December 31, 1953),

---

[6] SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

determined by the same method as the closing inventory for December 31, 1954.

Section 481 was new in the 1954 Code. Prior to its enactment there was considerable uncertainty and confusion as to the circumstances of a change in accounting method. In the case of a change initiated by the taxpayer, the regulations made it clear that permission for a change would not be granted unless the taxpayer and the Commissioner agreed to the terms and conditions of the change. (See, for example, Reg. 118, sec. 39.41–2(c).) If, on the other hand, the change was initiated by the Commissioner, problems arose, but by 1953 we had established the rule and were affirmed that, with respect to a change of accounting method involving inventory, the Commissioner could not initiate a change unless he computed the opening inventory of the year of change on the same basis as the closing inventory. See *Commissioner* v. *Schuyler*, 196 F. 2d 85 (C.A. 2, 1952), affirming a Memorandum Opinion of this Court; and *Commissioner* v. *Dwyer*, 203 F. 2d 522 (C.A. 2, 1953), affirming a Memorandum Opinion of this Court.

As originally enacted, section 481 did not permit any adjustments with respect to pre-1954 Code years. The concluding clause "unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer" did not appear in the section as originally enacted. It was added by the Technical Amendments Act of 1958. The report of the Senate Finance Committee on the Technical Amendments Act of 1958 (S. Rept. No. 1983, 85th Cong., 2d Sess.) stated in part as follows (1958–3 C.B. 965, 966) :

Generally, under the 1939 Code taxpayers who requested permission to change their method of accounting were required to make certain adjustments, in the year of change, to prevent income or expenses from being included or deducted more than once, or to prevent their omission entirely. *However, where the Internal Revenue Service had required taxpayers to change their method of accounting, the courts usually did not require these adjustments to be made.* Where such changes were voluntary and the adjustments were made, the "bunching" of income which occurred in the taxable year of change frequently resulted in an especially heavy tax burden.

Section 481 of the 1954 Code for the first time provided statutory rules with respect to these adjustments. *This section requires these adjustments to be made in full to the extent that they are attributable to 1954 or a subsequent year. However, no adjustments are required which are attributable to years before the application of the 1954 Code.*

\*     \*     \*     \*     \*     \*     \*

The House report suggests that there is no reason why the pre-1954 Code year adjustments should not be made, *when taxpayers, of their own volition,* have changed their method of accounting. It points out that this was, in fact, generally the practice under the 1939 Code. \* \* \*

Your committee agrees with the House that pre-1954 Code year adjustments should be made where taxpayers of their own accord changed their method of

accounting. For that reason, it has accepted the basic features of the House provision. * * *

(a) *Permanent features.—Neither the House bill nor your committee's amendments affect present law with respect to pre-1954 adjustments where the change in method of accounting is not initiated by the taxpayer.* Where the change is initiated by the taxpayer, the adjustments, to the extent attributable to years before 1954, must be made in computing taxable income. * * *

* * * *A change in the taxpayer's method of accounting required by a revenue agent upon examination of the taxpayer's return would not, however, be considered as initiated by the taxpayer.* [Emphasis supplied.]

An analysis of the provisions of section 481(a) shows that, to determine its applicability to the instant case, the following questions arise:

(1) Is the $1-per-unit practice of inventorying used trailers a "method of accounting"?

(2) Would a change in the inventorying of used trailers from the $1-per-unit practice to the lower of cost or market value method constitute a change in the method of accounting?

(3) Is the change initiated by the petitioner or by the respondent?

We think petitioner's practice of inventorying used trailers at $1 each was a "method of accounting." It represents the accounting treatment of an item, namely, the inventorying of used trailers, and section 1.446–1(a) of the Income Tax Regulations provides that "The term 'method of accounting' includes * * * the accounting treatment of any item." It may have been an erroneous method[7] but it was a "method." That the petitioner's practice of inventorying used trailers at $1 each was a method of accounting was unequivocally testified to by at least five well-qualified certified public accountants whose testimony was offered by petitioner. Respondent offered the testimony of a certified public accountant who was of the opinion that petitioner's practice could not be called a method of accounting. We are convinced, however, that petitioner's practice of inventorying used trailers at $1 each was a method of accounting. We have so found as an ultimate fact.

As to whether there was a change in the method of accounting, the respondent contends that section 481 has no application to this case for the reason that petitioner has always had only one "method of accounting" for inventorying used trailers, namely, the lower of cost or market, and that when it inventoried its used trailers at $1, the $1 was used as the nearest to market that was practicable. Respondent further contends along this line that when he changed the inven-

---

[7] See respondent's Income Tax Regs., sec. 1.471–2(f), which provide:

(f) The following *methods,* among others, are sometimes used in taking or valuing inventories, *but are not in accord with the regulations in this part:*

*         *         *         *         *         *         *

(2) Taking work in process, *or other parts* of the *inventory, at a nominal price or at less than its proper value.* [Emphasis supplied.]

tory of the used trailers acquired after December· 31, 1953, from $1 to the amounts here used he was merely correcting an error of valuation and was not changing a "method of accounting." This is a far different view on respondent's part from the one he entertained throughout his long controversy with petitioner and the only thing that stood in the way of a settlement years ago was that the change was a change of an accounting system with the consequent adjustments incident to such a change when initiated by respondent.

Petitioner has always used the lower of cost or market method in inventorying its manufactured goods. In most of the returns filed from 1926 through 1954 petitioner has indicated thereon that its inventories were taken at the lower of cost or market. There was a period from 1933 through 1939 when petitioner was not so positive on its returns and, in answer to the question of how its inventories were kept, petitioner would use such expressions as "Generally at lower of cost or market" or as in 1937 and 1938 "At cost and at lower of cost or market except for repossessed and traded-in trailers." The label used by petitioner is, however, not decisive.[8] The evidence shows that $1 was never regarded as the market value of the used trailers. At the beginning it was so difficult to determine the value, if any, of the used trailers that petitioner inventoried them at $1, more for identification than anything else, and respondent accepted that practice at that time.

It is true that petitioner's method of inventorying its used trailers was different from its method of inventorying its manufactured goods. In this connection petitioner points out that when respondent changed the inventory of the 3,428 (3,600 minus 172) used trailers acquired after December 31, 1953, from $1 each to $5,388,024.97 he changed the "treatment of a material item" in petitioner's inventory of used trailers as reported by petitioner in its 1954 return and, therefore, under section 1.481–1(a)(1) of respondent's Income Tax Regulations pertaining to section 481, this was a "change in the method of accounting" as that term is used in section 481.[9] Also, see sec. 1.446–1(e)(2), Income Tax Regs.[10]

---

[8] In *Aluminum Castings Co.* v. *Routzahn*, 282 U.S. 92, the Supreme Court, in speaking of the label used, said: "But whether a return is made on the accrual basis, or on that of actual receipts and disbursements, is not determined by the label which the taxpayer chooses to place upon it."

[9] Sec. 1.481–1(a)(1):

A change in method of accounting to which section 481 applies includes a change in the over-all method of accounting for gross income or deductions, *or a change in the treatment of a material item.* * * * [Emphasis supplied.]

[10] Sec. 1.446–1(e)(2), in discussing changes of accounting methods, states:

(1) * * * A change in the method of accounting includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item. * * *

(ii) Examples of changes requiring consent are: * * * a change involving the method or basis used in the valuation of inventories * * *.

Four of petitioner's expert witnesses were specifically asked if the change which the respondent made in 1954 was a "change in the method of accounting" and whether he had changed the "treatment of a material item" and all of those witnesses responded very definitely in the affirmative.

We find and hold that the change in the inventorying of used trailers from $1 per unit to the lower of cost or market was a change in the method of accounting and that obviously it was initiated by the respondent.

This brings us to the application of paragraph (2) of subsection (a) of section 481 [11] before it was amended by the Technical Amendments Act of 1958. The applicable provision reads as follows:

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, *except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply* * * *. [Emphasis supplied.]

Under section 7851(a)(1)(A) of the 1954 Code, section 481 would not apply to the year 1953. Therefore, under section 481 "there shall not be taken into account any adjustment in respect of" the year 1953. Cf. *Transamerica Corp.* v. *U.S.*, —— F. Supp. —— (Jan. 23, 1964).

Petitioner, in its brief, closes its argument under section 481 as follows:

Thus, if the petitioner is to be required to change to lower of cost or market method of inventorying used trailers, such a change would be a change in the accounting method for a material item not initiated by the taxpayer. The adjustments to prevent omission of amounts of income would not include the inventory amounts attributable to 1953 and prior years. Accordingly, in computing income for the year of a change, the difference between the opening inventory of used trailers at lower of cost or market and at $1 per unit (namely $2,509,646.97) must be excluded in computing the adjustment.

Originally, the respondent in his determination of the deficiency for 1954 determined that at the beginning of the year petitioner's inventory of used trailers was 2,411 units valued at $2,411; and that at the end of the year it was 3,600 units valued at $5,696,885.84 or $5,693,285.84 more than the value of $3,600 reported by petitioner. In an amendment to answer to amended petition the respondent alleged that he erred to the extent of the 172 used trailers included in the 3,600; that these 172 used trailers had been acquired prior to January 1, 1954, and were carried in the closing inventory for 1953 at $172; that, under section 1013 [12] of the 1954 Code, these 172 trailers

---

[11] See fn. 6.

[12] SEC. 1013. BASIS OF PROPERTY INCLUDED IN INVENTORY.

If the property should have been included in the last inventory, the basis shall be the last inventory value thereof.

should have remained in the inventory at $172; and that the closing inventory for 1954 was actually made up of two classifications of used trailers, as follows (see footnote 1):

| Number of units | Value reported | Value respondent now contends |
|---|---|---|
| [1] 172 | $172 | $172.00 |
| [2] 3,428 | 3,428 | 5,388,024.97 |
| 3,600 | 3,600 | 5,388,196.97 |

[1] Acquired before Jan. 1, 1954.
[2] Acquired after Dec. 31, 1953.

We know of no authority and the respondent has not cited any that would permit an inventory such as the used trailers here involved to be split up into two or more classifications depending upon when the trailers were acquired. At the close of 1954 petitioner had on hand in its inventory 3,600 used trailers. Since respondent had decided that petitioner could no longer inventory its used trailers at $1 per unit but must inventory them at the lower of cost or market, we think the latter method must be applied to the entire 3,600 trailers on hand on December 31, 1954, and that the inventory value of those 3,600 trailers was the amount of $5,696,885.84 as originally determined by respondent. Furthermore, as will be more fully discussed later, it is our opinion that petitioner is correct in its contention that the opening inventory of the 2,411 used trailers on January 1, 1954, should be $2,512,057.97 instead of $2,411. That being so, it follows that the 172 trailers still on hand on December 31, 1954, should be inventoried at the lower of cost or market, namely, at $308,860.87 as originally determined by respondent, instead of $172 as now contended for by respondent. We hold, therefore, that respondent did not err as affirmatively alleged in his amendment to answer to amended petition (see footnote 1). Section 1013 has no application where, as in the instant case, there has been a change in the accounting method.

This places the respondent in the same situation he was in when the years 1942 through 1945 were being considered except that here the double deduction for petitioner is greater. There, the respondent would not agree to value the 879 used trailers on hand at January 1, 1942, at their lower of costs or market value of $568,108.76 because the petitioner would receive a windfall of $567,229.76. Now, respondent contends that petitioner is not entitled to value the 2,411 used trailers on hand on January 1, 1954, at the lower of cost or market value of $2,512,057.97 because petitioner will in effect receive a double deduction of $2,509,646.97. The reason for this situation is that even before

the enactment of section 481 under a long line of cases [13] beginning with *Thomas Shoe Co., supra*, it has been held that where the Commissioner changes a method of accounting by using a different method of valuing inventories at the end of the year he is required, in order clearly to reflect income for that year, to value the opening inventory according to the same method as the closing inventory. We do not understand that section 481 requires any different result where the change is initiated by the Commissioner. See S. Rept. No. 1983, 85th Cong., 2d Sess., *supra*. In the instant case this means that the opening inventory for 1954 of the 2,411 used trailers should also be valued at the lower of cost or market, which is $2,512,057.97. The result, of course, is that the difference between the value at the lower of cost or market and the $1-per-unit value, or $2,509,646.97, would have made 1953 income that much greater and 1954 income, as determined by the respondent, that much less. Income that belonged in 1953 cannot be taxed in 1954 simply because the Government will lose the 1953 tax. *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359; *United States* v. *Lewis*, 340 U.S. 590; *Commissioner* v. *Mnookin's Estate*, 184 F. 2d 89 (C.A. 8, 1950), affirming 12 T.C. 744; *Commissioner* v. *Frame*, 195 F. 2d 166 (C.A. 3, 1952), affirming per curiam 16 T.C. 600; *Commissioner* v. *Schuyler*, *supra*. See also *Virginian Hotel Corporation of Lynchburg* v. *Helvering*, *supra*. We quote from the *Schuyler* case as follows:

For the taxable year 1947, the Commissioner required the taxpayers to change from the cash basis of reporting income to the accrual basis, on which their books were kept, and included in gross income the closing inventory of the year but disallowed the deduction of the opening inventory. The Tax Court permitted the taxpayers to deduct the opening inventory. The correctness of this ruling is the sole question presented.

The facts are undisputed. * * * For the calendar year 1947 the opening inventory was $5,048.86 and the ending inventory was $5,010.85. * * *

Section 41 of the Code * * * requires (1) the income to be computed "upon the basis of the taxpayer's annual accounting period," and (2) "in accordance with the method of accounting regularly employed in keeping the books of such taxpayer." It also provides (3) that if the method employed does not clearly reflect income, "the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect income." It should be noted that in the case at bar the Commissioner did not require the taxpayers to change the method regularly employed in keeping their books, but only their method of reporting income for taxation. He takes the position that in changing from a cash to an accrual method of reporting income it is necessary in the first year of change, in order to clearly reflect income, to include the ending inventory in gross income without any deduction of the opening inventory. *In support*

---

[13] Some of the other cases cited by petitioner are: *Commissioner* v. *Schuyler*, 196 F. 2d 85 (C.A. 2, 1952), affirming a Memorandum Opinion of this Court; *Caldwell* v. *Commissioner*, 202 F. 2d 112 (C.A. 2, 1953), modifying and affirming a Memorandum Opinion of this Court; *Commissioner* v. *Dwyer*, 203 F. 2d 522 (C.A. 2, 1953), affirming a Memorandum Opinion of this Court; and *David W. Hughes*, 22 T.C. 1 (1954).

*of that position he argues that to allow the deduction of the 1947 opening inventory would result in allowing as deductions for that year items which the taxpayers had already deducted in other years, because, as one of them testified, the cost of merchandise comprising beginning inventory had been deducted as purchases in 1946 and prior years.* It may well be that the taxpayers, by reason of erroneously reporting on the cash basis, realized income in prior years on which they did not pay taxes because such income was invested in inventory items whose cost was deducted from gross receipts in such years. *But it does not follow that such income is taxable in 1947.* As shown by the first clause of section 41, the taxable income is to be computed on an *annual basis.* See also 26 U.S.C.A. § 42(a). Hence, a deduction erroneously taken in a prior year cannot be treated as income of a later year on the theory that it will otherwise escape taxation. * * *

\* \* \* \* \* \* \*

How seriously the Commissioner's method of computation distorts the income becomes apparent if attention be directed to figures. The opening inventory for 1947 was $5,048.86; the ending inventory was $5,010.85. The taxpayer's net income as reported without the use of inventories was $5,958.06. Computed with due regard for both opening and ending inventories it was $5,920.05, or $38.01 less than if computed without the use of inventories. As computed by the Commissioner with no allowance for the opening inventory it would be $10,968.91, or practically double what the books disclosed. * * * [Emphasis supplied.]

We think that, under the decisions culminating in *Schuyler* and *Dwyer*, the opening inventory must be computed on the same basis or method of accounting as the closing inventory in order to obtain the required consistent treatment, even if this course of action gives the taxpayer an undue benefit. In other words, the basis of the 2,411 trailers on hand on January 1, 1954, will, for future computation of gain or loss, be taken at $2,512,057.97 instead of $2,411. It should be noted that while petitioner will benefit by a large windfall in 1954 by reason of computing the *opening* inventory at the lower of cost or market, at the same time its income for 1954 will be $5,693,285.84 ($5,696,885.84 less $3,600) greater by reason of computing the *closing* inventory at the lower of cost or market.

It seems to be the rationale of both the decisions of the courts as well as section 481 that where a change in accounting method occurs the tax must be computed on the income and deduction of a single year and this method must be followed even though there may at times be advantages or disadvantages resulting therefrom. Thus, it is better that the taxpayer be the recipient of a windfall than to bunch income in a current year that should have been regarded as income in an earlier year. However, where the change in accounting method is initiated by the petitioner, any advantage gained by it must be compensated for although under section 481(b)(4)(B), I.R.C. 1954, the blow is softened by spreading over a period of 10 years the gain which otherwise would be "bunched" in a single year.

We do not regard section 1.161–1 of the Income Tax Regulations or section 7852(c), I.R.C. 1954, cited by respondent, as requiring a treatment different from the *Schuyler* and *Dwyer* decisions or section 481.

Respondent relies to a great extent on *Visintainer* v. *Allan*, 191 F. Supp. 425 (D. Colo. 1961), affirmed per curiam 301 F. 2d 312 (C.A. 10). The taxable years involved in the *Visintainer* case were the fiscal years ending October 31, 1946, through October 31, 1950. There, as stated by the court, "The principal issue to be decided is the proper valuation of the sheep taxpayers had on hand on November 1, 1945." The taxpayers had carried those sheep in their inventory at November 1, 1945, as they had done for several prior years, according to the "unit-livestock-price" method, the ewes being valued at $6.50 per head and the bucks at $15 per head, or a total inventory of $39,759. Following an audit of the taxable years the Government required taxpayers to value all sheep purchased subsequent to November 1, 1945, at "cost" and so include them in inventory, *or, in the alternative*, to treat them as a capital asset subject to depreciation. The taxpayers elected the alternative. Such animals were thereupon *taken out of the inventory*, valued at cost, and depreciated. The taxpayers then insisted on taking the animals out of the November 1, 1945, inventory of $39,759, valuing them at a cost of $62,654.74, and depreciating them on the new basis. This the Government refused to do and was sustained. The facts in the instant case are distinguishable. The taxpayers in *Visintainer* made an election. They were bound by their election. There was no question of opening or closing inventory. The principle in *Schuyler* and *Dwyer* was not involved in *Visintainer*. There was no "bunching" of income. The court in *Visintainer* specifically noted that "The record does not show any attempt by the Internal Revenue Service to include in the 1946–1950 income any income properly allocable to years prior to 1946." In the instant case, there is no election involved but rather a change in the method of inventorying used trailers initiated by the respondent.

A case more nearly in point here is *D. E. Alexander*, 22 T.C. 234. There the respondent contended that to allow the cost of certain cattle sold in 1945 and 1946 which had been deducted by the taxpayer in prior years would be allowing the taxpayer a second, or double, deduction for the same cost. In holding against the respondent, we said:

Under the method of accounting which petitioner followed, he deducted the cost of the cattle in the year of purchase. In determining the deficiencies for 1945 and 1946, the respondent did not include such cost in the cost of the cattle sold in those years, namely $75,940.60, and $35,692.74, respectively, *on the theory that to do so would allow the petitioner a second, or double, deduction for the identical cost.*

Petitioner contends that, under the rationale of *Commissioner* v. *Dwyer*, 203 F. 2d 522, and *Caldwell* v. *Commissioner*, 202 F. 2d 112, the respondent's deter-

mination is erroneous. We agree with the petitioner. The respondent's determination presents essentially the same problem as was involved in the *Dwyer* and *Caldwell* cases. Although the respondent's determination in this proceeding did not require petitioner to change from a cash to an inventory-accrual method of accounting, and inventories or accounts receivable are not involved here, there is no distinction in principle between this case and the cited authorities.

The cost of the cattle which were purchased prior to 1945, and were sold in 1945 and 1946, was improperly deducted by the petitioner in determining income of a prior year or years. *The respondent, in failing to allow deduction in 1945 and 1946 of the cost of the cattle which were sold in 1945 and in 1946, has, in effect, attempted to tax in 1945 and 1946 income of a prior taxable period or periods, the taxation of which is now barred by the statute of limitations. This he cannot do. David W. Hughes,* 22 T.C. 1. * * * [Emphasis supplied.]

The primary reason that the respondent has for seeking to take petitioner off the $1-per-unit method of inventorying used trailers is because such method does not in fact or in law reflect income on an annual basis. Perhaps he should have made the change years ago when the so-called windfall for petitioner would not have been as large as in 1954. We have given careful consideration to all of the arguments made and cases cited both pro and con and have come to the conclusion that if the annual accounting concept is to be applied, as indeed it must, it should be applied fully and uniformly so that the opening and closing inventories are computed on the same basis. *Thomas Shoe Co.; Commissioner* v. *Schuyler; Commissioner* v. *Dwyer; David W. Hughes,* all *supra.*

We hold that the opening and closing inventories of used trailers for the year 1954 are $2,512,057.97 and $5,696,885.84, respectively.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

BRUCE and WITHEY, *JJ.,* dissent.